**No. 21-2122**

# In the
# United States Court of Appeals
## for the Seventh Circuit

ERIC R. BRANT, et al.,

*Plaintiffs-Appellants,*

v.

SCHNEIDER NATIONAL, INC., et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin, No. 1:20-cv-01049-WCG.
The Honorable **William C. Griesbach**, Judge Presiding.

## SEPARATE APPENDIX TO BRIEF OF PLAINTIFFS-APPELLANTS

MICHAEL J.D. SWEENEY
GETMAN, SWEENEY &
DUNN, PLLC
260 Fair Street
Kingston, New York 12401
(845) 255-9370

JENNIFER KROLL
SUSAN MARTIN
MICHAEL M. LICATA
MARTIN & BONNETT, P.L.L.C.
4747 North 32nd Street, Suite 185
Phoenix, Arizona 85018
(602) 240-6900
smartin@martinbonnett.com

EDWARD TUDDENHAM
23 Rue du Laos
75015 Paris, France
+33 06 84 79 8930

*Counsel for Plaintiffs-Appellants*
*(Full list of all appellants on inside cover)*




Eric R. Brant, Eric Alexander, Joshua Arrington, Wayne R. Avery, Jeremy A. Baldwin, Jeffrey Baldwin, Derrick C. Banks, Clarence Barber, Dwight Bardot, Ronald Barman, Tiffaney Barrett, Curtis R. Bennett, James C. Berns, Olufemi Bertha, Rogelio A. Blake, Jazae Blunt, Donna Brackbill, Victor D. Brown, Ronald Brown, Steven W. Bryan, Clifford Butterweck, Thomas Campbell, Milton Carrol, James Carstarpen, Christopher J. Chaisson, Arriel S. Cochran, Darrell Coleman, Christopher E. Collier, David J. Collins, Joseph J. Cook, Giovanni Cunningham, Ronald Deese, Richard E. Derragon, Terri Derragon, Jimmy Doolittle, Gabriel Duran, Jeffrey Ealy, Margo Ealy, George Ellis, Frank Flowers, Ronald Fritz, Joseph Goldade, Louis Gonzalez, DeWayne Greene, Brian Greenleaf, Jay G. Hanson, Mark A. Hart, Aimee Henery, Terrence Hicks, James E. Higgs, Daniel Hollins, Barry Hopkins, Thomas C. Istre, Matthew Johnson, Randy Jones, Franklin Jones, Dawn Keller, Lloyd Kenebrew, Derrick Lee Sr., Steven Lindsey, Omar Lindsey, Charles Lundeby, Sean Madison, Paul R. Martin, Scott F. Maurin, Jeffrey McClelland, Jeff McDonald, Douglas M. McGowan, Joseph Meshkin, Peter J. Metzger, William Meyers, Kendrick Montgomery, Curtis L. Montgomery, Don L. Moore, Stephen Nixon, Edward K. Oden, Levar Osby, Joey Palmer, Jonathan Pauldo, Michael Phariss, Travis Pregler, Regina Price, Louis M. Ramirez, Sirena Rich, Latoya Richardson, Amanda Ronk, Raul A Rosales, Helen Ruppel, Denis Sandoval, Brian Saunders, Donald W. Sebens, Paul M. Sherrod, Andy S. Silva Portillo, Willie Sims, David Sloan, Jerry Smith, DeAngelo Smith, Edward Stanton, Jocelyn Tate, Bobby Terrazas, Lilirs Thibodeaux Jr., Joseph Thompson, Ellis S. Tidwell, Michael Tolliver, Pedro A Torres, Patrick Toy, Michael L. Tucker, Duwayne Tucker, Shayenne A. Villa, Isiah Williams, Edward R. Wills, and Jerry Worthy

## TABLE OF CONTENTS TO SEPARATE APPENDIX

Plaintiff's Notice of Appeal, Doc. 85, filed June 17, 2021 .................................................SA-1

First Amended Complaint, Doc. 63, filed February 18, 2021...........................................SA-4

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

ERIC R. BRANT,

        Plaintiff,

v.

SCHNEIDER NATIONAL INC.,
SCHNEIDER NATIONAL CARRIERS INC.,
SCHNEIDER FINANCE INC., and DOE
DEFENDANTS 1-10,

        Defendants.

_____/

Case No. 1:20-cv-01049-WCG
Judge William C. Griesbach

**PLAINTIFF'S NOTICE OF APPEAL**

Notice is given that Plaintiff Eric Brant, together with those individuals who filed their written consent to sue pursuant to 29 U.S.C. § 216(b)— Aimee Henery, Eric Alexander, Joshua Arrington, Wayne R. Avery, Jeremy A. Baldwin, Jeffrey Baldwin, Derrick C. Banks, Clarence Barber, Dwight Bardot, Ronald Barman, Tiffaney Barrett, Curtis R. Bennett, James C. Berns, Olufemi Bertha, Rogelio A. Blake, Jazae Blunt, Donna Brackbill, Victor D. Brown, Ronald Brown, Steven W. Bryan, Clifford Butterweck, Thomas Campbell, Milton Carrol, James Carstarpen, Christopher J. Chaisson, Arriel S. Cochran, Darrell Coleman, Christopher E. Collier, David J. Collins, Joseph J. Cook, Giovanni Cunningham, Ronald Deese, Richard E. Derragon, Terri Derragon, Jimmy Doolittle, Gabriel Duran, Jeffrey Ealy, Margo Ealy, George Ellis, Frank Flowers, Ronald Fritz, Joseph Goldade, Louis Gonzalez, DeWayne Greene, Brian Greenleaf, Jay G. Hanson, Mark A. Hart, Terrence Hicks, James E. Higgs, Daniel Hollins, Barry Hopkins, Thomas C. Istre, Matthew Johnson, Randy Jones, Franklin Jones, Dawn Keller, Lloyd Kenebrew, Derrick Lee Sr., Steven Lindsey, Omar Lindsey, Charles Lundeby, Sean Madison, Paul R. Martin, Scott F. Maurin, Jeffrey McClelland, Jeff McDonald, Douglas M. McGowan,

1

SA-1

Joseph Meshkin, Peter J. Metzger, William Meyers, Kendrick Montgomery, Curtis L.

Montgomery, Don L. Moore, Stephen Nixon, Edward K. Oden, Levar Osby, Joey Palmer,

Jonathan Pauldo, Michael Phariss, Travis Pregler, Regina Price, Louis M. Ramirez, Sirena Rich,

Latoya Richardson, Amanda Ronk, Raul A Rosales, Helen Ruppel, Denis Sandoval, Brian

Saunders, Donald W. Sebens, Paul M. Sherrod, Andy S. Silva Portillo, Willie Sims, David

Sloan, Jerry Smith, DeAngelo Smith, Edward Stanton, Jocelyn Tate, Bobby Terrazas, Lilirs

Thibodeaux Jr., Joseph Thompson, Ellis S. Tidwell, Michael Tolliver, Pedro A Torres, Patrick

Toy, Michael L. Tucker, Duwayne Tucker, Shayenne A. Villa, Isiah Williams, Edward R. Wills,

and Jerry Worthy—hereby appeal to the United States Court of Appeals for the Seventh Circuit

from the Judgment entered in this action on May 20, 2021 (ECF No. 84), the Decision and Order

Granting Defendants' Motion to Dismiss dated May 20, 2021 (ECF No. 83), and the Decision

and Order Granting Defendants' Motion to Dismiss dated January 19, 2021, and the decisions

contained therein (ECF No. 58). Plaintiff Eric Brant also appeals on behalf of a class of similarly

situated individuals as described in the Complaint and the Amended Complaint.


Respectfully submitted: June 17, 2021


By:  /s/ Michael J.D. Sweeney
GETMAN, SWEENEY & DUNN, PLLC
Michael J.D. Sweeney
Meagan M. Rafferty
260 Fair Street
Kingston, NY 12401
(845) 255-9370
msweeney@getmansweeney.com
mrafferty@getmansweeney.com

MARTIN & BONNETT, P.L.L.C.
Susan Martin
Michael M. Licata

SA-2

4747 N. 32nd Street, Suite 185
Phoenix, Arizona 85018
(602) 240-6900
smartin@martinbonnett.com
mlicata@martinbonnett.com

Edward Tuddenham
23 Rue Du Laos
Paris, France
33 684 79 89 30
etudden@prismnet.com

ATTORNEYS FOR PLAINTIFFS

3

SA-3

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

Eric R. Brandt,

                    Plaintiff,

v.

Schneider National, Inc., Schneider National
Carriers, Inc., Schneider Finance, Inc., & DOE
Defendants 1-10,

                    Defendants.

Case No. 1:20-cv-01049-WCG
Judge William C. Griesbach

**JURY TRIAL DEMANDED**

**FIRST AMENDED COMPLAINT**

SA-4

1.      This lawsuit arises out of Defendants' intentional scheme to misclassify truck drivers as independent contractors (hereafter "misclassification scheme"). The suit seeks redress for violations of the Fair Labor Standards Act, 29 U.S.C. § 201, et. seq. ("FLSA") and Wisconsin state law for failing to pay required minimum wages and unlawfully deducting amounts from the wages of misclassified drivers, for unjust enrichment, and for violations of the Truth in Leasing Act ("TILA") pursuant to 49 U.S.C. § 14704 for requiring Plaintiff and other drivers to enter into leases that violated the provisions of that Act.

2.       Plaintiff brings his federal minimum wage claim under the collective action provision of the FLSA as set forth in 29 U.S.C. § 216(b) and his state claims and TILA claims as class actions pursuant to Rule 23 of the Federal Rules of Civil Procedure.

3.      Defendants include Schneider National Inc., a publicly traded company, and its wholly owned subsidiaries, Schneider National Carriers, Inc., and Schneider Finance, Inc. (collectively, "Defendants" or "Schneider") which are owned and operated for a common business purpose: transportation of freight for Schneider's customers.

4.      To accomplish its business purpose, Schneider relies on thousands of long-haul, interstate truck drivers to deliver freight across the United States.

5.      Schneider's drivers include "company drivers," who Schneider classifies as employees, and so called "owner-operators," who Defendants misclassify as independent contractors. Defendants refer to the drivers it categorizes as independent contractors as "owner-operators" even though most of them own nothing and instead lease their trucks from Schneider.

6.      According to Schneider's quarterly report filed with the Securities and Exchange Commission for the period ending September 30, 2020, Schneider had an average of 10,052 trucks

1

available per month to transport freight, of which 2,802 (or about 26.6%) were operated by so-called "owner-operators."

7.    According to Schneider's public filings with the United States Department of Transportation, Schneider had 12,919 drivers and over 1.1 billion miles driven for its commercial vehicles during 2019.

8.    Defendants' scheme to misclassify drivers, including Plaintiff and proposed FLSA and Rule 23 Class Members (collectively, "Drivers"), as independent contractors is designed to allow Defendants to control Drivers as employees and obtain all of the benefits of such control while depriving Drivers of all federal and state protections for employees, such as Title VII of the Civil Rights Act of 1964, the Family and Medical Leave Act, the National Labor Relations Act, and the wage protections of the FLSA and Wisconsin law. Pursuant to their misclassification scheme, Defendants pay Drivers less than the minimum wage required by federal and state law, and unlawfully shift virtually all related business expenses and risk to the Drivers

9.    Defendants' scheme to misclassify Drivers as independent contractors allows Defendants to evade the tax burdens they would bear for employees—e.g., Social Security, Federal Unemployment Tax, etc.—which burdens are also shifted to the misclassified Drivers.

10.    Defendants misclassification scheme also allows Defendants to obtain a vast competitive advantage over competitor trucking companies that properly classify their drivers as employees and pay required wages, taxes, and business expenses in compliance with federal and state law.

11.    Defendants also violated the Truth in Leasing Act by requiring Drivers to sign Owner Operator Operating Agreements (hereafter "Operating Agreements") that failed to comply

with the requirements of that Act. Those violations injured Drivers by contributing to their wages falling below the statutory minimum and causing them to fall into debt.

12.     Schneider is one of the largest trucking companies in the country and its misclassification practices drive down wages across the trucking industry and undercut fair labor practices throughout the United States.

13.     Defendants scheme to misclassify Drivers was undertaken knowingly and intentionally.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. Specifically, this action is brought under 29 U.S.C. § 216(b) of the FLSA and 49 U.S.C. § 14704. Jurisdiction over Plaintiff's claims for declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202.

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1337 because the claims arise under federal laws regulating commerce.

16.     Plaintiff's claims involve matters of national and/or interstate commerce.

17.     Plaintiff and Class Members were engaged in commerce in their work for Defendants.

18.     This Court has supplemental jurisdiction over the state law claims raised by virtue of 28 U.S.C. §§ 1332 and 1367, including § 1367(a).

19.     Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391 because all Defendants reside in this District for venue purposes and/or are subject to the Court's personal jurisdiction in that they have substantial contacts with and conduct business in this District. Venue is also proper because the contracts and leases at issue in this case at all relevant

3

SA-7

times required any claims or disputes to be brought exclusively in the state or federal courts located in Brown County, or Green Bay, Wisconsin.

## PARTIES

**Named Plaintiff**

20.    Plaintiff Eric R. Brant is a resident of Ohio. His FLSA consent to sue form was attached to his original complaint.

21.    Plaintiff Brant worked for Defendants as a truck driver from approximately December 2018 to August 2019.

**Defendants**

22.    Defendant Schneider National, Inc. is a publicly traded transportation and logistics services company formed under the laws of Wisconsin.

23.    Defendant Schneider National Carriers, Inc. is a corporation formed under the laws of Nevada.

24.    Defendant Schneider National Carriers, Inc. is a motor carrier registered with the Department of Transportation.

25.    Defendant Schneider National, Inc. and Schneider National Carriers, Inc. have the same principal office located at 3101 S. Packerland Dr., Green Bay, WI 54313.

26.    Defendant Schneider Finance, Inc., is a corporation formed under the laws of Wisconsin.

27.    Defendant Schneider Finance, Inc.'s principal office is located at 911 Glory Rd., Green Bay, WI 54304.

28.    Defendants Schneider National Carriers, Inc. and Schneider Finance, Inc. are wholly owned subsidiaries of Defendant Schneider National, Inc.

SA-8

29.    Defendants conduct business throughout the United States, including in Wisconsin.

30.    Doe Defendants 1 through 10 are individuals and corporations who are unknown to Plaintiff who therefore sues the Doe Defendants by fictitious names. Plaintiff will amend this Complaint to state their true names and capacities when they have been ascertained.

## CLASS ALLEGATIONS

**FLSA**

31.    Plaintiff brings his federal minimum wage claim under the collective action provision of the FLSA as set forth in 29 U.S.C. § 216(b) individually and on behalf of a proposed collective action consisting of: "all persons who leased a truck from Schneider Finance and drove it for Schneider National Inc. or any of its subsidiary, related, or affiliated companies pursuant to an Owner Operator Operating Agreement with Defendants ("Operating Agreement" or "Agreement") at any time during the period December 2013 (or such earlier date as Schneider first inserted language similar to ¶8(e) of Doc. 20-3 into the Operating Agreement) through the date of final judgment." This period of time is referred to herein as the "class period." The proposed collective action class is referred to herein as the "FLSA Class."

**Rule 23**

32.    At all relevant times the leases and contracts at issue in this case provided that they will be governed and enforced in accordance with the substantive laws of the State of Wisconsin and any applicable federal law except that the Operating Agreement, which contained an arbitration provision, provided that arbitration provisions would be governed exclusively by the Federal Arbitration Act.

33.    Plaintiff brings his claims under Wisconsin wage law set forth herein under Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a class of similarly situated

SA-9

persons defined as: "all persons who leased a truck from Schneider Finance and drove it for Schneider National Inc. or any of its subsidiary, related, or affiliated companies pursuant to an Owner Operator Operating Agreement with Defendants ("Operating Agreement" or "Agreement") at any time during the period December 2013 (or such earlier date as Schneider first inserted language similar to ¶8(e) of Doc 20-3 into the Operating Agreement) through the date of final judgment." This proposed class is referred to herein as the "Wisconsin Wage Class."

34.    Plaintiff brings his Wisconsin unjust enrichment claim pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a similarly situated persons defined as "all persons who leased a truck from Schneider Finance and drove it for Schneider National Inc. or any of its subsidiary, related, or affiliated companies pursuant to an Owner Operator Operating Agreement ("Operating Agreement" or "Agreement") at any time during the six years prior to the filing of the original complaint through the date of final judgment and subject to any equitable tolling for any applicable portion of the limitations period." This class is referred to herein as the "Unjust Enrichment Class."

35.    Plaintiff brings his TILA claim pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a class of similarly situated persons defined as: "all persons who leased a truck from Schneider Finance and drove it for Schneider National Inc. or any of its subsidiary, related, or affiliated companies pursuant to an Owner Operator Operating Agreement ("Operating Agreement" or "Agreement") during the four years prior to the filing of the original complaint through the date of final judgment and subject to any equitable tolling for any applicable portion of the limitations period." This proposed class is referred to herein as the "TILA class."

36.    Excluded from the FLSA and Rule 23 Classes are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at

6

SA-10

any time during the relevant class period has had, a controlling interest in any Defendant or supervised any Driver. Also excluded are fleet drivers—i.e., individuals who signed Operating Agreements to lease two or more trucks to Schneider to be operated at the same time. A Driver who leased one truck after another to Schneider but only operated one at a time, or who drove a substitute vehicle while his or her leased vehicle was undergoing repairs would be a member of the class.

37.     "Persons" as used in the FLSA and Rule 23 class definitions includes individuals who operated under a business name and/or who signed an Operating Agreement using a business name.

38.     The persons in the Rule 23 Classes are so numerous that joinder of all members is impracticable. The precise number of such persons is not known to Plaintiff, however, because the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

39.     On such information and belief, Plaintiff alleges that there are thousands of members in each of the Rule 23 Classes.

40.     There are questions of law and fact common to the members of the Rule 23 Classes that predominate over any questions solely affecting individual members of the Classes, including but not limited to:

    a.  Whether the Rule 23 Class members have provided services to Defendants as employees rather than independent contractors under Wisconsin law;

    b.  Whether Defendants failed to compensate Rule 23 Class members with required minimum wages in violation of Wisconsin law;

c.  Whether Rule 23 Class members have incurred employment-related expenses and losses in performing their duties for Defendants;

d.  Whether Defendants have made deductions from compensation paid to Rule 23 Class members in violation of Wisconsin law;

e.  Whether Defendants imposed unconscionable and/or unlawful Lease and "Independent Contractor" contracts upon Drivers in violation of Wisconsin law;

f.  Whether Defendants were unjustly enriched by imposition of unconscionable contracts upon Drivers;

g.  Whether Drivers are entitled to declaratory judgment as to any of the claims identified herein;

h.  Whether the Operating Agreement that Defendants required Drivers to sign failed to specify the compensation Drivers were to receive as required by 49 C.F.R. 376.12(d);

i.  Whether the Operating Agreement that Defendants required Drivers to sign failed to clearly specify all the charge backs that Defendants deducted from Drivers' pay as required by 49 C.F.R. 376.12(h);

j.  Whether the Operating Agreement Defendants required Drivers to sign failed to specify the amount of any escrow fund or performance bond required to be paid by Drivers as required by 49 C.F.R. 376.12(k); and

k.  The nature and extent of Class-wide injury and the appropriate measure of damages for the Class members.

41.  The claims of Plaintiff are typical of the claims of each of the Rule 23 Classes he seeks to represent insofar as he alleges that (a) Defendants have a policy and pattern or practice of

8

exercising the powers of an employer with respect to him and the Rule 23 Classes; (b) Defendants failed to pay him and the Rule 23 Classes all wages due; (c) Defendants made unlawful and excessive deductions from his wages and the wages of the members of the Rule 23 Classes; and (d) Defendants failed to pay him and members of the Rule 23 Classes the minimum wages for all hours worked; (e) Defendants subjected Plaintiff and members of the Rule 23 Classes to unconscionable terms and conditions as set forth in the Operating Agreement and lease agreements; and (f) Defendants had a policy and practice of failing to adhere to provisions of their Operating Agreements required by the federal Truth in Leasing Act, which failure violated the federal Truth in Leasing Act.

42.     Plaintiff and his counsel will fairly and adequately represent and protect the interests of the Rule 23 Class members.

43.     Defendants have acted or refused to act on grounds generally applicable to the Rule 23 Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Rule 23 Class as a whole under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

44.     The class claims are also properly maintainable as class actions under Rule 23(b)(3) of the Federal Rule of Civil Procedure. A class action is superior to other available methods for the fair and efficient adjudication of this case, particularly in the context of wage litigation like the present action, where individual Class Members may lack the financial resources to vigorously prosecute a lawsuit in federal court against Defendants of this size and with far greater resources. The members of the Rule 23 Class have been damaged and are entitled to recovery as a result of Defendants' common and uniform policies, practices, and procedures. In addition, class treatment

9

is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

## FACTS

45.    Defendants hired Plaintiff and other Drivers to transport goods in interstate commerce, picking up and dropping off freight throughout the United States.

46.    During the class period, Defendants classified the majority of their drivers as "employees" for purposes of the FLSA and Wisconsin Labor Laws. These drivers are known as "company drivers."

47.    During the class period, Defendants also utilized Drivers, i.e., Plaintiff and the members of the FLSA and Rule 23 classes, all of whom it classified as "independent contractors."

48.    Although Defendants misclassified Drivers as independent contractors, they were, at all relevant times, "employees" of Defendants for purposes of the FLSA and Wisconsin labor law.

49.    Defendants were, at all relevant times, Plaintiff's "employer" and the "employer" of proposed FLSA and Rule 23 Class Members as that term is defined by the FLSA and Wis. Stat. § 104.01. Alternatively, Defendants were, at all relevant times, joint employers of Plaintiff and the FLSA and Rule 23 Class Members.

50.    Doe Defendants 1 through 10 are individuals and corporations who, upon information and belief are "employers" of Drivers under the FLSA and Wis. Stat. § 104.01. Alternatively, Doe Defendants were, at all relevant times, joint employers of Drivers with one or more of the other Defendants.

51.    Defendant Schneider National, Inc. is the only shareholder identified on corporate filings for Defendants Schneider National Carriers, Inc. and Schneider Finance, Inc.

SA-14

52.     Defendants have overlapping officers, including Mark Rourke who is the CEO of Defendant Schneider National, Inc. and President of Defendant Schneider National Carriers, Inc., Jonathon Johnson who is the Secretary and Treasurer of Defendant Schneider National Carriers, Inc. and Secretary of Defendant Schneider Finance, Inc., and Nicholas Anderson, who is the Director of Defendants Schneider National Carriers, Inc. and Schneider Finance, Inc.

53.     Defendants are an enterprise engaged in interstate commerce for purposes of the FLSA.

54.     Defendants are operated as a single enterprise within the meaning of 29 U.S.C. § 203(r)(1).

55.     All Defendants benefit from their scheme to misclassify Drivers.

56.     Upon information and belief, Defendants each grossed more than $500,000 in each of the last six calendar years, individually and collectively.

57.     Defendant Schneider National, Inc. has reported annual revenues exceeding $4 billion per year, with $4.97 billion in revenue for 2018, $4.74 billion in 2019, and revenues exceeding $3.2 billion in the nine months ending September 30, 2020.[1]

58.     All actions and omissions described in this complaint were made by Defendants directly or through their supervisory employees and agents.

59.     During the class period, Defendants sought to recruit drivers to enter into Operating Agreements with Defendants. These Operating Agreements required a driver to agree (1) to lease a truck to Defendants that would be under Defendants' "exclusive possession, control, and use"

---

[1] Defendant Schneider National Inc.'s reported revenue includes revenue derived from its subsidiaries, including Defendants Schneider Finance, Inc. and Schneider National Carriers, Inc.

for the duration of the Operating Agreement, (2) to operate the leased truck to haul goods for Defendants and (30 pay for all costs of operating the leased truck.

60.    The Operating Agreement characterized drivers who entered into such agreements as independent contractors.

61.    During the class period, Plaintiff and, on information and belief, the vast majority, of drivers recruited by Schneider, did not own a truck or have the credit or financial resources to lease or operate one on their own. They were, as a result, not in a position to enter into an Operating Agreement.

62.    In order to make it possible for Drivers to enter into Operating Agreements and to induce them to do so, Schneider offered to lease trucks to Drivers for no money down, no payments for the first weeks of work, or other capital investment by the Drivers so that they could then re-lease the truck to Schneider as required by the Operating Agreement. The lease by which a Driver rented a truck from Schneider is referred to herein as a "Lease."

63.    As a further inducement to enter into an Operating Agreement, Schneider offered to use its credit to advance all costs of operating the truck so that Drivers could operate their truck indefinitely with no out-of-pocket investment whatsoever as long as Schneider continued to assign them sufficient loads and they continued hauling those loads for Schneider.

64.    Prior to leasing a truck to Drivers, Schneider did not conduct credit checks on Drivers or inquire about Drivers' finances or whether Drivers had past experience operating an independent business.

65.    Plaintiff completed high school and, although he took courses at a community college and an online university for short periods, the highest degree he has obtained is his high school diploma. On information and belief, the majority of Drivers recruited to enter into

Operating Agreements had little formal education beyond high school and they generally lacked business acumen and experience to operate an independent business.

66.    Plaintiff and other Drivers recruited by Schneider were required to attend a multi-day orientation and training session before they began work, during which they were trained in Schneider's policies, practices, and procedures in areas such as driving, handling loads, and safety.

67.    Schneider expected Drivers to comply with these polices, practices, and procedures which, on information and belief, were the same policies, practices, and procedures Schneider required its company drivers to adhere to.

68.    Drivers who had previously worked as company drivers for Schneider did not have to attend the full orientation period as they had already received training in Schneider's policies, and procedures.

69.    Either shortly before or after the orientation, Schneider presented recruited Drivers, including Plaintiff, with a Lease and Operating Agreement to sign.

70.    On information and belief, the Leases Schneider offered to Drivers during the class period were similar in all material respects.

71.    On information and belief, the Operating Agreements Schneider offered to Drivers during the class period were similar in all material respects.

72.    Both the Lease and the Operating Agreement were pre-printed forms drafted by Defendants containing a total of over 100 pages of fine print.

73.    The Lease and Operating Agreement were presented to Drivers as a single non-negotiable package and the two documents operated as a single contract.

74.    Defendants did not explain that Defendants retained the right to terminate the Operating Agreement at will and that termination of the Operating Agreement would automatically

place a Driver in default of his Lease with all of the financial penalties flowing from default (as set forth in more detail below).

75.     Defendants specifically told Drivers that they had no ability to negotiate any of the terms of the Lease and Operating Agreement.

76.     Defendants did not give Plaintiff and other Drivers adequate time to review the Lease and Operating Agreement prior to signing and prevented them from seeking legal advice before signing.

77.     Plaintiff Brant signed Defendants' Operating Agreement and Lease on December 3, 2018. The Operating Agreement was for a term ending January 31, 2019 and the Lease was for a two-year term ending December 18, 2020.

78.     At Defendants' request, Plaintiff signed a second Operating Agreement on January 2, 2019 that became effective on February 1, 2019. He worked pursuant to these Operating Agreements from December 2018 until approximately August 2019.

79.     Upon a Driver's signing an Operating Agreement and Lease, Schneider provided the Driver with fuel cards (to purchase fuel on Schneider's credit), truck registration, and communications equipment.

80.     Because one of Defendants' purposes in drafting the Operating Agreement was to misclassify Drivers as independent contractors, the Operating Agreement is replete with language that explicitly and implicitly mischaracterizes Drivers as independent contractors operating independent businesses and that purports to give Drivers rights that they cannot exercise as a practical matter or that Defendants do not allow them to exercise.

81.     Defendants exercised complete control over all meaningful aspects of the transportation business in which Plaintiff and other Drivers worked. Defendants controlled the

14

SA-18

advertising and solicitation of customers, all negotiations with customers regarding price, handling requirements, and pick-up and delivery times, all billing of customers, and all payment of company drivers and misclassified Drivers. Defendants provided and controlled all infrastructure necessary for dispatching and monitoring drivers and deliveries, and all necessary trailers, permits and licenses.

82.     Defendants set the terms under which Plaintiff and other Drivers worked through the Operating Agreement and Defendants' policies implementing that Agreement.

83.     Defendants controlled the manner in which Drivers would haul their loads by requiring Drivers to comply with Defendants' policies and procedures as well as with the requirements of Defendants' customers' that Defendants had agreed to without consulting Drivers. These were the same policies, procedures, and requirements that Defendants' company drivers had to comply with.

84.     As a result of Defendants pervasive control over all aspects of their transportation business, of which the Drivers were an integral part, Defendants maintained all necessary control over Drivers' work and did not relinquish any control to Drivers that would allow them to operate independently from Defendants.

85.     The Operating Agreement gave Defendants complete discretion as to whether and when they would offer loads to Drivers as well as over the kinds of loads they would offer.

86.     Defendants exercised unilateral control over the price that they would pay for loads offered to Drivers.

87.     Although the Operating Agreement stated that Drivers can drive for other carriers with Defendants' permission, nothing in the Agreement required Defendant to grant such permission.

88.     Defendants affirmatively told Drivers, including Plaintiff, that Defendants did not permit them to drive for other carriers.

89.     In addition, the conditions for obtaining Defendants' permission to drive for other carriers were so complex and onerous that Drivers could not, as a practical matter, carry loads for anyone other than Defendants. By way of example, the Operating Agreement provided that at the Driver's sole expense and without specificity or limitation, Defendants were free to hire a third party to monitor Drivers' purported "Compliance Safety and Accountability" performance during any period of driving for another carrier. And before being eligible for permission, a Driver had to report detailed information about the shipper or broker whose load the Driver sought to carry might desire to work for, which made it practically impossible for Drivers to obtain other work in compliance with the Operating Agreement. Even if the Driver had been able to meet all the requirements, Defendants could still withhold permission. If a Driver carried a load for a carrier other than Defendants without written permission, the Operating Agreement required the Driver to pay Defendants $1,000 and gave Defendants the ability to immediately terminate the Operating Agreement, which would put the Driver in default of the Lease, allowing Defendants to repossess the truck, accelerate all remaining Lease payments, and impose various charges on the Driver.

90.     Defendants exercised complete control over the number, kind, and price of loads that Drivers could haul, and in so doing, exercised complete control over Drivers' earnings. Drivers were as dependent on Defendants for their ability to earn a living as were Defendants' company drivers.

91.     Although the Operating Agreement stated that Drivers could turn down loads, because Drivers had no idea what alternative loads Defendants would offer if they did so, or when

or where alternative loads would be offered, the right to turn down loads offered Drivers no ability to exercise business judgment or increase their earnings.

92.     Because Drivers had to cover their fixed costs, including weekly Lease payments and advances each week, coupled with the fact that Drivers had no idea whether, when, or where an alternative load would be offered, made turning down a load extremely risky, and Drivers rarely exercised the option to do so.

93.     Drivers were regularly required to take unprofitable loads offered by Defendants because, if they did not, Defendants could exercise their right under the Operating Agreement to withhold loads for an indefinite period of time or to unilaterally terminate the Agreement.

94.     Defendants could also require Drivers to take unprofitable or undesirable loads by manipulating the alternative loads they offered to a Driver, for example by offering even less profitable loads as alternatives.

95.     Defendants regularly required that Drivers, including Plaintiff, move empty trailers from one location to another at rates that did not even cover the cost of fuel to accomplish the task. Schneider told Plaintiff that Schneider would terminate his contract if he refused to take these assignments.

96.     If there were no loads available where a Driver was, the Driver had to either drive (without compensation) to a location where a load was available or wait for an indefinite period of time for a load to become available where he was.

97.     Although the Operating Agreement gave Drivers the ability to decide when they would work, the requirement that they make weekly Lease payments and pay the advances made by Defendants or risk termination of their Operating Agreement, made it very difficult for Drivers to take time off from work. As long as Defendants offered loads, Plaintiff and other Drivers

generally worked to the maximum limit allowed by DOT regulations except when their truck was being repaired or they were prevented from working for personal reasons. While the ability to decide when they would work may have afforded Drivers some personal freedom, it gave them no opportunity to exercise managerial skill or increase their earnings.

98.     Given the availability of company drivers and the need for Drivers to work to pay their weekly fixed costs and advances, Defendants generally had no need to set specific work schedules for Drivers. If they needed a Driver to work, they had the ability to make the Driver do so by threatening, implicitly or explicitly, to provide no other loads or to terminate the contract. On information and belief, Defendants also had the ability to—and often did—make only particular loads available to Drivers, hiding more profitable or otherwise desirable loads, thereby coercing Drivers to accept certain load(s), even if the load was unprofitable.

99.     Although the Operating Agreement generally gave Drivers the right to choose their routes (except in certain cases dictated by Defendants), as well as their fuel and rest stops, these rights afforded Drivers no opportunity to exercise managerial skill or to increase their earnings. As a practical matter, Drivers had no choice with respect to the route they took given Defendants' requirement that Drivers strictly adhere to the pick-up and delivery times negotiated by Defendants, Drivers' need to keep operating costs at a minimum, and Drivers' need to follow routes where they could obtain fuel on Defendants' credit. For this same reason, Defendants had no need to dictate the routes taken by Drivers. Defendants' misclassification scheme, which put all operating costs on Drivers and which permitted termination upon late delivery, was more than sufficient to control the routes Drivers would take.

100.     Although the Operating Agreement allowed Drivers to hire substitute drivers to drive for them with Defendants' permission, hiring a substitute driver provided a Driver no

18

opportunity to exercise business judgment or increase his earnings; it simply meant sharing the amounts paid by Defendants with another person. Even with a substitute driver, a Driver was still entirely dependent on Schneider to offer sufficient profitable loads to cover his or her fixed costs, advances as well as the cost of paying the substitute driver; if Defendants did not offer sufficient loads, something Defendants alone could control, having a substitute driver was just one more drain on a Driver's income in addition to his or her other fixed costs. Accordingly, the right to hire a substitute driver offered Drivers no benefit. Plaintiff did not hire a substitute for this reason and few, if any, other Drivers hired substitutes.

101.    Although the Operating Agreement states that Drivers were responsible for "selecting, purchasing, financing, maintaining, operating and insuring" their equipment, because Drivers were entirely dependent on the credit extended by Defendants to pay these expenses, these responsibilities afforded Drivers no meaningful control over their work, and no ability to exercise business judgment to increase profits. Plaintiff and other Drivers purchased their base plates, permits, communication system, fuel, maintenance and repairs, and insurance directly from Defendants or through entities selected by Defendants; Plaintiff and other Drivers could not afford to exercise independent judgment with respect to any of these matters because Plaintiff and other Drivers were dependent on Defendants' credit, and by extension, subject to Defendants' terms and conditions with respect to using credit for such purchases. Maintenance schedules were controlled by Defendants, and Plaintiff and other Drivers generally had to use providers chosen by Defendants and authorized for use with Defendants' credit.

102.    Plaintiff and other Drivers had no investment in the trucks they leased through Schneider Financing. Down payments, capital outlay, and operating costs were generally advanced by Defendants subject to deduction from a Driver's weekly earnings. As long as Drivers received

19

SA-23

sufficient loads from Schneider to cover those deductions, Drivers could drive indefinitely without investing any capital whatsoever. If Plaintiff and other Drivers did not receive sufficient loads from Schneider to cover that Driver's Lease payment, their Lease could be terminated and that Driver would lose all Lease payments they had previously made, while still owing the remaining payments under the Lease. Plaintiff and other Drivers had no equity in their truck.

103.    The only "skill" possessed by Plaintiff and other Drivers was their ability to drive large trucks using a commercial driver's license which was exactly the same "skill" as Defendants' company drivers.

104.    Plaintiff and other Drivers had no special skill in operating independent businesses.

105.    Defendants did not select Drivers based on their ability to operate a business. By arranging for all necessary insurance, communication devices, accounting services, and advancing all operating costs, Defendants' misclassification scheme ensured that Drivers did not need to have any ability to operate an independent business. The only skill Drivers needed was the ability to drive a truck.

106.    As set forth in Schneider's filings with the Securities and Exchange Commission, retention of so-called "owner-operators," including Drivers, is essential to their business model and profitability.

107.    Although Operating Agreements were generally for a fixed term of one year, in entering into such Agreements, Defendants intended the work relationship with a Driver to continue indefinitely on satisfactory performance.

108.    Defendants routinely renewed the Operating Agreement by sending Drivers a new Operating Agreement to sign prior to the expiration of their current Agreement and by sending reminder notices to Drivers if they failed to sign the new contract.

109.    Defendants drafted Leases to have a longer term than the Operating Agreement as a way to force Drivers to renew their Operating Agreements and continue driving for Defendants.

110.    Termination or expiration of the Operating Agreement would put a Driver in default of his or her Lease if the Driver failed "within five (5) days thereafter, to enter into a new [Operating Agreement]" approved by Schneider in its sole discretion.

111.    Unless a Driver could pay all remaining Lease payments, or pay various charges imposed by Defendants, defaulting on the Lease meant that the Driver's truck was repossessed, all payments previously made on the truck were forfeited, and all remaining payments due on the Lease became immediately due and owing. These draconian financial consequences made it nearly impossible for Drivers to risk Lease default by refusing to renew their Operating Agreements with Defendants after the one-year period.

112.    Defendants specifically told Plaintiff and other Drivers that if their Operating Agreements were terminated or expired, they would be in default of their Leases, would forfeit their escrow accounts, and would owe the remaining Lease payments.

113.    Defendants also informed Drivers that if a Driver did not renew his or her Operating Agreements, Defendants would stop assigning loads to the Driver, even while their current Agreement was still in effect.

114.    During the term of an Operating Agreement, Defendants routinely extended advances and credit to Drivers that would require the Drivers to renew their Operating Agreements in order to be able to repay the advances and credit.

115.    The Operating Agreement allowed Defendants to terminate the Agreement without cause on 15-days' notice. That power, along with the draconian financial consequences that would flow from termination of the Operating Agreement, allowed Defendants to exercise plenary control

over Drivers' work, including the power to change the terms of the Operating Agreement and Lease at will.

116.    Plaintiff and other Drivers were not in business for themselves when they worked for Defendants. They were only able to work by virtue of the loads Defendants offered them, Defendants' credit and Defendants' willingness to advance all costs of operating the truck, including fuel, all necessary insurance, repairs, and maintenance costs.

117.    Schneider handled the payment of fuel taxes on behalf of Drivers—something that few, if any, Drivers had the financial ability or knowledge to do their own.

118.    Schneider offered Drivers advances and extended credit when their weekly settlements were insufficient to cover the costs advanced by Schneider.

119.    Without Schneider's credit and Schneider's arranging for and advancing the costs of operation, Plaintiff and other Drivers would have fallen into arrears in their payments to Defendants and had their Operating Agreements terminated.

120.    Defendants controlled the manner in which Drivers worked in the same way Defendants controlled their company drivers whom Defendants classified as employees.

121.    Depending on the number and quality of loads offered by Defendants, those who had been company drivers made less as Drivers than they did as company drivers.

122.    Drivers were required to follow Defendants' work rules and procedures, which were the same rules and procedures applicable to company drivers. These work rules covered such things as where to park a truck, how and when locks must be placed on trailers, whether and when they must stay with their truck, how to load and unload trailers, how to pick up and deliver loads, and how to hire extra help to assist with loading and unloading. The work rules also set rules for personal appearance and demeanor.

123.    Defendants monitored the way Drivers operated their trucks, including monitoring speed, location, hard-braking incidents and other critical driving events, hours of service, and engine operation data. Defendants also required Drivers to agree that Defendants could use that information for any purpose Defendants deemed advisable, including discipline of Drivers. On information and belief Defendants conducted the same monitoring of company drivers.

124.    Defendants controlled the speed at which Drivers operated their trucks, requiring them to drive no more than 70 mph even if the posted speed limit was higher. Drivers were subject to discipline for failing to adhere to Defendants' speed rules.

125.    Defendants required Drivers to maintain contact with Defendants' dispatch office and driver manager.

126.    Defendants required Drivers to obtain Defendants' permission before allowing passengers in their trucks.

127.    Defendants retained the right to, and did, take loads away from Plaintiff and other Drivers, even after Drivers had accepted the loads offered by Defendants.

128.    Defendants controlled how Plaintiffs and other Drivers spent their earnings by requiring Drivers to maintain escrow and maintenance accounts funded through deductions from Drivers' weekly earnings.

129.    As a result of the facts alleged in the foregoing paragraphs, Drivers were dependent on Schneider for their livelihood. They were not independent contractors, but instead were employees of Schneider.

130.    Schneider failed to pay minimum wages free and clear to Drivers.

131.    Instead, Schneider calculated the pay for Drivers by a weekly accounting that makes deductions from Drivers' pay for various expenses that are for the benefit of Schneider.

132.    Schneider requires Drivers to pay, *inter alia*, for fuel, insurance, taxes, tolls, ferry fees, equipment maintenance and repairs, road taxes, mileage taxes, licensing fees, permitting costs, and, in the case of Lease Drivers, lease payments.

133.    Schneider deducts the lease payments, security deposit payments, insurance payments, maintenance costs, and repair costs from Drivers' paychecks or directly from Drivers' bank accounts.

134.    Schneider also deducts from Drivers' paychecks amounts to fund an "escrow account" held by Schneider as purported "security" for unstated "obligations" of Drivers. If at any point the "escrow account" drops below the balance required by Schneider, Schneider deducts additional funds from Drivers' paychecks to replenish the "escrow account."

135.    Schneider also deducts amounts from Drivers' paychecks for a "Maintenance Reserve," which Schneider holds and uses to pay for repair and maintenance obligations. On information and belief, Schneider often pays itself from these so-called "maintenance reserves."

136.    On information and belief, the escrow and maintenance accounts are not returned to Drivers upon termination.

137.    Drivers are required to pay for comprehensive and collision damage insurance, bodily injury, and property damage insurance only from insurers approved by Schneider.

138.    On information and belief, Schneider receives insurance payments through its own captive insurer, thereby extracting additional revenue from the Drivers.

139.    If the trailers or other equipment provided to Drivers by Schneider are damaged during the course of Drivers' work, Schneider also deducts the cost of the repairs directly from Drivers' paychecks.

140.     The deductions described above are business expenses of Defendants that reduce Drivers' wages.

141.     While Defendants' misclassification scheme described herein shifts the costs of maintaining Defendants' fleet and general business operations to Drivers, Defendants keep all the benefits.

142.     This scheme also shifts the risk of trucking business downturns from Defendants to Drivers as Defendants are not obligated to give Drivers any specific amount of work while Drivers have continuing fixed lease payments and other obligations to Schneider each week regardless of the number of loads, if any, that Schneider offers in a week.

143.     In some weeks, the deductions from Drivers' pay yielded pay rates below federal and state wage guarantees, and in some weeks Drivers ended up owing Defendants money at the end of a week of work.

144.     By way of example only, for the week of May 2, 2019, Plaintiff Brant drove over 3,000 miles carrying 5 loads for Schneider and received $0.00 as his net settlement.

145.     Drivers also receive no pay for certain compensable hours, including, *inter alia*, time Drivers are engaged to wait during non-sleeping time in the sleeper berth, and non-driving time, such as pre- and post-inspection time, waiting time, time filling out paperwork, and other work time for which Plaintiff and Class Members were entitled to be paid.

146.     In some weeks, Defendants failed to pay Plaintiff and other Drivers the minimum wage for each hour worked, including compensable hours for which no compensation was paid.

147.     Defendants' classification of Plaintiff and other Drivers as independent contractors caused them loss of wages, additional tax burdens, insurance obligations, and a variety of other monetary and non-monetary compensable harm.

148.    Defendants' failure to pay Plaintiff and other Drivers the proper wages required by federal law was willful.

149.    Defendants' unlawful conduct, as set forth in this Complaint, was intentional, willful, and/or in bad faith, and has caused significant damages to Plaintiff and other Drivers.

150.    Defendants were aware or should have been aware that the law required them to pay Plaintiff and other Drivers minimum wages required by law.

151.    Upon information and belief, Defendants apply the same unlawful policies and practices to the Drivers in every state in which they operate.

152.    The Operating Agreement and Lease are procedurally and substantively unconscionable.

153.    The Operating Agreement and Lease are procedurally unconscionable, including, without limitation, as a result of each of the following:

    a.   The Operating Agreements and Lease are adhesion contracts drafted by Schneider.

    b.   The Operating Agreement and Lease are the product of a substantial disparity in bargaining power.

    c.   Drivers had no ability to negotiate the terms of the Operating Agreement or Lease. Defendants specifically told recruits that Drivers had no ability to negotiate any of the terms of the Lease and Operating Agreement.

    d.   The majority of Drivers recruited by Defendants to enter into the Operating Agreement had little formal education beyond high school and generally lacked business acumen and experience.

26

SA-30

      e.   Both the Operating Agreement and Lease are dense, lengthy, and difficult to decipher. Together, the Operating Agreement and Lease and their attachments are over 100 single-spaced pages of fine print.

      f.   Defendants did not adequately explain the terms of the Operating Agreement and Lease to Plaintiff or other Drivers.

      g.   Defendants did not give Plaintiff and other Drivers a reasonable time to review the Lease and Operating Agreement prior to requiring them to sign.

      h.   Defendants prevented Plaintiff and other Drivers from seeking legal advice before signing.

      i.   While the Operating Agreements contained the stated term of one-year, the Leases spanned multiple years. As a result, Drivers were generally required to sign new Operating Agreements every year or risk being in default of the lease. This allowed Schneider the ability to unilaterally modify the terms of the Operating Agreement each year.

      j.   Defendants could terminate the Operating Agreement at will which "immediately" put Drivers in default of the Lease unless, within five days, Drivers entered into a new Operating Agreement approved by Defendants in their sole discretion.

    154.   The Operating Agreement and Lease are substantively unconscionable, including without limitation, as a result of each of the following:

      a.   They provide Defendants the benefit of controlling Drivers like employees while shifting all operating expenses and risk of operation onto Drivers, something that Defendants could not legally do with employees.

27

SA-31

b.  They allow deductions made by Defendants to Drivers' pay to cover Defendants' business expenses, which resulted in Drivers earning less than the applicable minimum wage or even resulted in Drivers owing money to Defendants. The amounts extracted and withheld from Drivers pursuant to the Operating Agreement and Lease are unconscionable regardless of Defendants' misclassification of Drivers.

c.  Under the Operating Agreement and Lease, Drivers have continuing fixed financial obligations to Schneider each week regardless of the number of loads that Schneider offers. However, pursuant to the Operating Agreement and Lease, Defendants are not obligated to give Drivers any amount of work.

d.  Defendants retain the right to terminate the Operating Agreement at-will, which gives Defendants the right to automatically place a Driver in default of his or her Lease and impose all of the draconian financial penalties flowing from default (including, for example, making all payments immediately due while also allowing Defendants to repossess the truck at Drivers' expense), unless a Driver procured a new operating agreement acceptable to Defendants in their sole discretion within five days.

e.  The threat of default under the Lease and the severe financial penalties that can result is used by Schneider to compel Drivers into continuing to work for Schneider, despite earning less than the minimum wage, nothing at all, or less than nothing (owing Schneider money) in some workweeks.

f.  Although the Operating Agreement states that Drivers can drive for other carriers with Defendants' permission, nothing in the Agreement required Defendant to

28

grant such permission. In addition, as set forth in the Operating Agreement and Lease, the conditions for obtaining Defendants' permission to drive for other carriers were so complex and onerous that Drivers could not, as a practical matter, carry loads for anyone other than Defendants.

g.   The Operating Agreement unlawfully requires Drivers to indemnify Defendants for any damages, liabilities, attorneys' fees, or other losses suffered by Defendants as a result of their unlawful misclassification scheme.

h.   The Operating Agreement unlawfully allows Defendants to unilaterally rescind the Operating Agreement and demand repayment of all payments made under the Agreement in the event that Defendants' misclassification scheme is determined to be unlawful and Drivers are found to be employees.

155.   The Operating Agreement failed to comply with the requirements of the Truth in Leasing Act (TILA) and its implementing regulations. While the Operating Agreement states that Defendants shall provide Drivers a copy of the rated freight bill, or a computer-generated summary thereof, for those shipments where Plaintiff and other Drivers are paid based on a percentage of the revenue Defendants receive, the Operating Agreement failed to specify that Defendants would provide it at or before the time of settlement, as is required by TILA.

156.   Even when the Operating Agreement contained the provisions required by TILA, Defendants violated TILA by failing to comply with those provisions. Even though Defendants paid Plaintiff based on a percentage of the revenue Defendants received, Defendants did not provide Plaintiff or other Drivers with the rated freight bill, or other documentation actually used for a shipment containing the same information that would appear on a rated freight bill. Defendants further did not provide Plaintiff or other Drivers with copies of documents from which

the rates and charges are charges are computed, so Plaintiff and other Drivers could not verify or dispute their pay.

157.    On information and belief, Defendants underpaid Plaintiff and other Drivers, but because Defendants did not provide the rated freight bill or other documentation containing the same information that would appear on a rated freight bill, Plaintiff and other Drivers were not made aware of and could not contest the underpayment, which caused Plaintiff and other Drivers to lose wages and other earnings.

158.    Defendants failed to comply with TILA by failing to provide Plaintiff and other Drivers with the documents necessary to determine the validity of charge-back items deducted from Drivers' pay.

159.    On information and belief, Defendants overcharged Plaintiff and other Drivers for certain charge-back items, but because Defendants failed to provide documentation of the charges, Drivers could neither confirm the validity of the charge nor dispute the charges and suffered financial loss as a result.

160.    In one instance, Defendants withdrew approximately $1,200 from Plaintiff's bank account without providing any information regarding the reason for the charge or documentation for Plaintiff to determine the validity of the charge. When Plaintiff contacted Defendants to determine why the funds had been removed from Plaintiff's account and if necessary, dispute the charge, Plaintiff was unable to obtain any information from Defendants. Schneider National told Plaintiff that it had not withdrawn the funds and that Schneider Finance must have done so; Schneider Finance told Plaintiff that it had not withdrawn the funds. Plaintiff never learned what happened to the funds or why Schneider had withdrawn them. Because Defendants regularly failed to provide Plaintiff and other Drivers with documentation of chargebacks, Plaintiff could neither

confirm nor dispute the validity of this and other charges, and he suffered financial harm as a result.

161.    The Operating Agreement and Lease, which Defendants required Drivers to sign and which together acted as a single contract, violated TILA because they failed to specify the amount of all escrow funds or performance bonds Drivers were required to pay. Instead, the Lease provided Defendants with the discretion to require a security escrow payment of a limitless amount should a Driver attempt to terminate their Operating Agreement with Defendants.

162.    The Lease allowed Defendants to require Brant and other Drivers to pay a Security Deposit of an unspecified amount if the Drivers sought to terminate their Operating Agreement and take their truck to another company. This unspecified Security Deposit requirement was an integral part of Defendants' scheme to use the Lease and Operating Agreement together to force Drivers to work for less than the minimum wage. When Plaintiff attempted to leave Defendants' employment and take his truck to work for another company, Defendants applied the Security Deposit provision at such a level as to prevent Plaintiff from doing so. As a result, Plaintiff continued to work for Schneider for less than the minimum wage, and when he finally left, Defendants seized Plaintiff's truck for failing to pay the Security Deposit. The loss of his truck caused Plaintiff substantial financial harm.

163.    Defendants' failure to specify the amount of all escrow funds or performance bonds required to be paid by Lease Drivers prevented Drivers, like Plaintiff, from seeking employment elsewhere to improve their wages and conditions of employment. It caused Drivers who sought to work for other Carriers, like Plaintiff, financial injury from unanticipated expenses driving them into lease default.

**FIRST CAUSE OF ACTION**

**(VIOLATION OF THE FAIR LABOR STANDARDS ACT)**

164.    Plaintiff individually and on behalf of the FLSA Class re-alleges and incorporates by reference all allegations in all preceding paragraphs.

165.    At all relevant times, Plaintiff and the members of the FLSA Class are or were employees of Defendants within the meaning of 29 U.S.C. § 203(e).

166.    Defendants failed to pay minimum wages to Plaintiff and proposed Class Members in violation of the Fair Labor Standards Act, 29 U.S.C. § 206 *et seq.* and its implementing regulations by failing to pay anything for certain hours worked and/or by failing to pay at least the minimum wage for each hour worked per workweek.

167.    Defendants' failure to pay FLSA-required minimum wages was willful within the meaning of the FLSA.

168.    Defendants' failure to comply with the FLSA minimum wage protections caused Plaintiff and proposed FLSA Class members to suffer loss of wages and interest thereon.

169.    Plaintiff and the FLSA Class Members are entitled to relief for Defendants violations of the FLSA pursuant to 29 U.S.C. § 216(b).

170.    To facilitate the right of FLSA Class Members to participate in this action, the Court should issue notice to the FLSA Class informing them of their right to participate in the suit by filing a consent to sue form. There are numerous similarly situated current and former employees of Defendants who have suffered from Defendants' common policies and practice of not paying required minimum wages for all hours worked and who would benefit from the issuance of Court-supervised notice of the present lawsuit and the opportunity to join the lawsuit. Those similarly situated employees are known to Defendants and readily identifiable through Defendants' records.

## SECOND CAUSE OF ACTION

## (MINIMUM WAGE VIOLATIONS UNDER WISCONSIN LAW)

171.    Plaintiff individually and on behalf of the Rule 23 Class re-alleges and incorporates by reference all allegations in all preceding paragraphs.

172.    At all relevant times, Plaintiff and members of the Rule 23 Class were Defendants' "employees" within the meaning of Wis. Stat. §§ 103.001(5), 104.01(2), and 109.01(1r).

173.    Wisconsin law requires employers to pay all employees at least the minimum wage for all hours worked. Wis. Stat. § 104.02; Wis. Admin. § DWD 272.03.

174.    Wisconsin law also requires employers to pay employees "all wages earned by the employee to a day not more than 31 days prior to the date of payment." Wis. Stat. § 109.03.

175.    Plaintiff and members of the Rule 23 Class are not exempt from the minimum wage requirements of Wisconsin law.

176.    During the applicable limitations period, Defendants had a policy and practice of failing to pay minimum wages to Plaintiff and members of the Rule 23 Class for certain hours worked and/or by failing to pay at least the minimum wage for each hour worked per work week.

177.    As a result of Defendants' failure to pay minimum wages earned and due to Plaintiff and members of the putative Rule 23 Class, Defendants have violated, and continue to violate, Wis. Stat. §§ 104.02, 109.03, and Wis. Admin § DWD 272.03.

178.    As a result of these violations, Plaintiff and members of the Rule 23 Class, are entitled to relief, including their unpaid wages earned and due as provided by Wis. Stat. §§ 104.02 and 109.03, penalties due under Wis. Stat. § 109.11, and recovery of attorneys' fees, costs, and expenses of this action, as provided by Wis. Stat. § 109.03(6), as well as such other legal and equitable relief from Defendants' unlawful and willful conduct as the Court deems just and proper.

## THIRD CAUSE OF ACTION

## (UNJUST ENRICHMENT)

179.    Plaintiff individually and on behalf of the Rule 23 Class re-alleges and incorporates by reference all allegations in the preceding paragraphs.

180.    The Operating Agreement and Lease Defendants required Plaintiff and members of the Rule 23 Class to sign are unconscionable.

181.    Defendants' unconscionable agreements are void, or alternatively, voidable by under common law.

182.    Defendants have been unjustly enriched by their deductions from and the withholding of wages of Plaintiff and members of the Rule 23 Class and by the unconscionable fees extracted by Defendants that shift virtually all costs of maintaining Defendants' fleet and general business operations to Drivers.

183.    Under the circumstances, it would be inequitable for Defendants to retain the amounts deducted from Drivers' wages and the fees paid by Drivers.

## FOURTH CAUSE OF ACTION

## (VIOLATIONS OF THE TRUTH IN LEASING ACT)

184.    During the applicable limitations period, Defendants had a policy and practice of requiring Plaintiff and other Drivers to enter into an Operating Agreement that, *inter alia,* failed to clearly specify when Defendants would provide Drivers with the rated freight bill (or other documentation actually used for a shipment containing the same information that would appear on a rated freight bill) when the Driver's pay is based on a percentage of Defendants' gross revenue for a shipment ; and, along with the Lease, failed to specify the amount of all escrow funds or performance bonds required to be paid by Drivers.

34

185.    During the applicable limitations period, Defendants had a policy and practice of failing to adhere to those provisions of the Operating Agreement required by 49 C.F.R. § 376.12 by, *inter alia*, failing to compensate Plaintiff and other Drivers in the manner and amounts specified in the Operating Agreement; failing to provide Plaintiff and other Drivers copies of the rated freight bill or documentation actually used for a shipment containing the same information that would appear on a rated freight bill, at or before the time of settlement when the Driver's pay is based on a percentage of Defendants' gross revenue for a shipment; failing to provide Plaintiff and other Drivers with documentation from which the pay rates and charges are computed; overcharging Plaintiff and other Drivers for charge-back items; failing to provide Plaintiff and other Drivers copies of documents necessary to determine the validity of charge-back items.

186.    As a result of Defendants' policies and practices, Defendants have violated, and continue to violate, 49 C.F.R. § 376.12. Drivers have suffered actual injury as a result of these violations for which they are entitled to relief.

187.    As a result of these violations, Plaintiff and other Drivers have lost wages and other compensation due them and are entitled to relief, including recovery of attorneys' fees, costs, and expenses of this action, as provided by 49 U.S.C. § 14704.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter the following relief:

1.  With respect to FLSA Violations:

    a.  Certification of the FLSA Class pursuant to the FLSA, 29 U.S.C. § 201, *et seq.*;

    b.  Permission for Plaintiff to notify similarly situated current and former employees of their right to opt-in to this action to pursue a claim under the FLSA, pursuant to 29 U.S.C. § 216(b);

    c.   Entry of a declaratory judgment that the practices complained of herein are unlawful;

    d.   An award of damages for all minimum wages, wrongfully withheld deductions, and other unpaid wages that are due to the named Plaintiff and all similarly situated employees under the FLSA;

    e.   Statutory liquidated damages under the FLSA;

    f.   A finding that Defendants' violation of the FLSA was willful and that, therefore, the statute of limitations for the FLSA claim is three years exclusive of periods in which the statute of limitations should be equitably tolled;

    g.   Equitably estopping Defendants from asserting the FLSA statute of limitations with respect to any FLSA claims that were within limitations as of the date Defendants first inserted Paragraphs 8(f) and/or 24(e) of Doc 20-2, or similar terms, in its Operating Agreements;

    h.   Attorneys' fees and costs;

    i.   Pre- and post-judgment interest;

2.  With respect to the state law claims:

    a.   Certifying this action as a class action under Fed. R. Civ. P. 23;

    b.   Designating Plaintiff Brant as the Class Representative;

    c.   Designating the undersigned counsel as Class Counsel;

    d.   Entering a declaratory judgment that the practices complained of herein are unlawful;

    j.   Entering an Order equitably estopping Defendants from asserting the statute of limitations with respect to any Wisconsin labor law claims alleged herein that

were within limitations as of the date Defendants first inserted Paragraphs 8(f)

and/or 24(e) of Doc 20-2, or similar terms, in its Operating Agreements;

e.   Fashioning appropriate equitable and injunctive relief to remedy Defendants'

violations of law, including but not limited to an order determining that

Defendants' Operating Agreement and Lease are void, or voidable, or

alternatively severing any unconscionable clauses and enjoining Defendants from

continuing their unlawful practices described herein;

f.   Awarding statutory, compensatory, liquidated damages, appropriate statutory

penalties, restitution, and other make whole relief to be paid by Defendants

according to proof;

g.   Awarding Pre-judgment and Post-judgment interest as otherwise provided by law;

h.   Granting such other legal, injunctive and equitable relief as the Court may deem

just and proper;

i.   Awarding Plaintiff reasonable attorneys' fees and costs, including expert fees; and

j.   Awarding Plaintiff such other and further relief as this Court deems just and

proper.

3.   With respect to the TILA claims:

k.   Certifying this action as a class action under Fed. R. Civ. P. 23;

l.   Designating Plaintiff Brant as the Class Representative;

m.   Designating the undersigned counsel as Class Counsel;

n.   Entering a declaratory judgment that the practices complained of herein are

unlawful;

o. Fashioning appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not limited to an order determining that the leases that Defendants required Drivers to sign violate the requirements of the TILA;

p. Awarding statutory, compensatory, liquidated damages, appropriate statutory penalties, restitution, and other make whole relief to be paid by Defendants according to proof;

q. Awarding Pre-judgment and Post-judgment interest as otherwise provided by law;

r. Granting such other legal, injunctive and equitable relief as the Court may deem just and proper;

s. Awarding Plaintiff reasonable attorneys' fees and costs, including expert fees; and

t. Awarding Plaintiff such other and further relief as this Court deems just and proper.

4. Any other relief to which the named Plaintiff and similarly situated employees may be entitled.

Respectfully submitted this 18th day of February 2021.

By: */s/ Michael J.D. Sweeney*

GETMAN, SWEENEY & DUNN, PLLC
Michael J.D. Sweeney
Meagan M. Rafferty
260 Fair Street
Kingston, NY 12401
(845) 255-9370
msweeney@getmansweeney.com
mrafferty@getmansweeney.com

38

SA-42

MARTIN & BONNETT, P.L.L.C.
Susan Martin
Michael M. Licata
4747 N. 32nd Street, Suite 185
Phoenix, Arizona 85018
(602) 240-6900
smartin@martinbonnett.com
mlicata@martinbonnett.com

Edward Tuddenham
23 Rue Du Laos
Paris, France
33 684 79 89 30
etudden@prismnet.com

ATTORNEYS FOR PLAINTIFFS

39

SA-43

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2021, the Separate Appendix to Brief of Plaintiffs-Appellants was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Michael J.D. Sweeney*
Michael J.D. Sweeney
GETMAN, SWEENEY & DUNN, PLLC
Michael J.D. Sweeney
260 Fair Street
Kingston, NY 12401
(845) 255-9370
msweeney@getmansweeney.com

MARTIN & BONNETT, P.L.L.C.
Susan Martin
Jennifer Kroll
Michael M. Licata
4747 N. 32nd Street, Suite 185
Phoenix, Arizona 85018
(602) 240-6900
smartin@martinbonnett.com

Edward Tuddenham
23 Rue Du Laos
Paris, France
33 684 79 89 30
etudden@prismnet.com

ATTORNEYS FOR PLAINTIFFS-APPELLANTS