No. 21-2122

In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

ERIC R. BRANT, ET AL.,

*Plaintiffs–Appellants*,

v.

SCHNEIDER NATIONAL, INC., ET AL.,

*Defendants–Appellees.*

———————————

On Appeal from the United States District Court
for the Eastern District of Wisconsin
Honorable William C. Griesbach, District Judge;
Case No. 1:20-cv-01049-WCG

———————————

**RESPONSE BRIEF OF APPELLEES
SCHNEIDER NATIONAL, INC., ET AL.**

———————————

Gilbert C. Dickey
MCGUIREWOODS LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202
T: (704) 444-8854

Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716

Joel H. Spitz
Michael R. Phillips
MCGUIREWOODS LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
T: (312) 750-5704

*Counsel for Defendants–Appellees Schneider National, Inc., et al.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, Schneider Finance, Inc., and Schneider National Carriers, Inc. state that their parent corporation is Schneider National, Inc. ("Schneider").  Schneider is a publicly held corporation that owns 10% or more of the stock of Schneider Finance and Schneider National Carriers.

McGuireWoods LLP is the only firm that has appeared or will appear for Schneider Finance, Schneider National Carriers, and Schneider National in this case, including in the district court.

Dated: November 18, 2021                              Respectfully submitted,


                                                                     */s/ Gilbert C. Dickey*
                                                                     Gilbert C. Dickey

                                                                     *Counsel for Defendants–Appellees*
                                                                     *Schneider National, Inc., et al.*

i

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 2

STATEMENT OF ISSUES ........................................................................ 2

STATEMENT OF THE CASE .................................................................. 3

I.      Schneider And Brant's Agreement ................................................ 3

II.     Brant's Allegations ........................................................................ 6

III.    The District Court's Opinion ......................................................... 9

SUMMARY OF ARGUMENT ................................................................ 12

STANDARD OF REVIEW ...................................................................... 13

ARGUMENT ........................................................................................... 14

I.      Brant failed to plead that he was an employee of Schneider. ...... 14

    A.     The *Lauritzen* factors confirm that Brant was an independent contractor. ........ 15

        1.     Brant's extensive control over the manner in which he performed his work—including his ability to hire others to perform that work—supports independent contractor status. ..................................... 15

        2.     Brant's ability to set his own schedule and routes and to manage his own employees illustrates that his profit or loss depended on his managerial skills. .............................................................. 19

        3.     Brant's extensive investment to lease a truck and cover operating costs supports his classification as an independent contractor ................ 21

        4.     The skill required for Brant to perform under the Operating Agreement weighs in favor of independent contractor status. ............... 25

        5.     The temporary nature of Brant's contract suggests that he was an independent contractor. ......................................................... 26

        6.     Brant's involvement in work essential to Schneider's business does not undermine independent contractor status. ......................................... 29

B.    The district court's reliance on the Operating Agreement does not undermine its decision to dismiss. ....................................................... 30

II.    Brant cannot bring a claim for unjust enrichment because he agreed to a valid contract that governed his relationship with Schneider. .................................................. 32

III.    Brant has failed to allege any violation of the Truth-in-Leasing regulations ................... 35

A.    Brant has failed to allege damages from any violation of the Truth-in-Leasing regulations. ........................................................................................... 36

B.    Brant has failed to allege any violation of the Truth-in-Leasing regulations. ....................................................................................................... 39

1.    The Operating Agreement gave Brant the right to information from the freight bill at the time of settlement. .......................................... 39

2.    Schneider's disclosure of charge-backs complied with the Truth-in-Leasing regulations. ........................................................................ 41

3.    The Operating Agreement and Lease disclosed all required escrow funds. ........................................................................................... 44

CONCLUSION ................................................................................................... 45

REQUEST FOR ORAL ARGUMENT ................................................................ 45

CERTIFICATE OF COMPLIANCE .................................................................. 47

CIRCUIT RULE 30(d) STATEMENT ............................................................... 47

CERTIFICATE OF SERVICE ............................................................................. 48

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acosta v. Paragon Contractors Corp.*,
    884 F.3d 1225 (10th Cir. 2018) ........................................................ 26–27

*Alexander v. FedEx Ground Sys., Inc.*,
    765 F.3d 981 (9th Cir. 2014) ......................................................... 17, 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................ 14

*Baker v. Flint Eng'g & Constr. Co.*,
    137 F.3d 1436 (10th Cir. 1998) ...................................................... 25, 28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................ 14

*Berger v. Nat'l Collegiate Athletic Ass'n*,
    843 F.3d 285 (7th Cir. 2016) ......................................................... 14, 30

*Brock v. Mr. W Fireworks, Inc.*,
    814 F.2d 1042 (5th Cir. 1987) .............................................................. 31

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) ............................................................... 30

*Carrell v. Sunland Constr., Inc.*,
    998 F.2d 330 (5th Cir. 1993) ............................................................... 34

*Cont'l Casualty Co. v. Wisconsin Patients Comp. Fund*,
    473 N.W.2d 584 (Wis. App. 1991) ................................................. 13, 33

*Cromwell v. Driftwood Elec. Contractors, Inc.*,
    348 F. App'x 57 (5th Cir. 2009) .......................................................... 28

*Derolf v. Risinger Bros. Transfer, Inc.*,
    259 F. Supp. 3d 876 (C.D. Ill. 2017) .............................................. 16, 27

*Doe v. Swift Transp. Co.*,
    No. 2:10-cv-00899, 2017 WL 67521 (D. Ariz. Jan. 6, 2017) ......................... 24, 29

*Dole v. Snell*,
    875 F.2d 802 (10th Cir. 1989) ............................................................. 26

*Donovan v. Sureway Cleaners*,
   656 F.2d 1368 (9th Cir. 1981) .................................................. 24

*Doty v. Elias*,
   733 F.2d 720 (10th Cir. 1984) .................................................. 17

*Fulfillment Servs. Inc. v. United Parcel Serv., Inc.*,
   528 F.3d 614 (9th Cir. 2008) ............................................. 13, 36

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.*,
   161 F.3d 299 (5th Cir. 1998) .................................... 19-21, 31

*Keller v. Miri Microsystems LLC*,
   781 F.3d 799 (6th Cir. 2015) .................................................. 25

*Lindquist Ford, Inc. v. Middleton Motors, Inc.*,
   557 F.3d 469 (7th Cir. 2009) .................................................. 33

*Loc. 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL–CIO*
   *v. NLRB*,
   603 F.2d 862 (D.C. Cir. 1978) ................................................ 23

*Max Trucking, LLC v. Liberty Mut. Ins. Corp.*,
   802 F.3d 793 (6th Cir. 2015) .................................................. 23

*Mervyn v. Atlas Van Lines, Inc.*,
   882 F.3d 680 (7th Cir. 2018) .................................................. 35

*Narayan v. EGL, Inc.*,
   616 F.3d 895 (9th Cir. 2010) .................................................. 29

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co.*,
   632 F.3d 1111 (9th Cir. 2011) ................................................ 42

*Parrish v. Premier Directional Drilling, L.P.*,
   917 F.3d 369 (5th Cir. 2019) ............................................ 18–19

*Ruiz v. Affinity Logistics Corp.*,
   754 F.3d 1093 (9th Cir. 2014) .......................................... 17, 23

*Saleem v. Corp. Transp. Grp., Ltd.*,
   854 F.3d 131 (2d Cir. 2017) .............................................. 20, 22

*Scantland v. Jeffrey Knight, Inc.*,
   721 F.3d 1308 (11th Cir. 2013) .............................................. 18

*Sec'y of Labor, U.S. Dep't of Lab. v. Lauritzen,*
  835 F.2d 1529 (7th Cir. 1987) ...................................................... 14–15, 25–30, 34

*Stampley v. Altom Transport, Inc.,*
  958 F.3d 580 (7th Cir. 2020) .................................................................... 37–38

*State Comp. Ins. Fund v. Brown,*
  32 Cal. App. 4th 188, 38 Cal. Rptr. 2d 98 (1995) ...................................... 21, 25

*Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.,*
  553 F.3d 559 (7th Cir. 2009) ................................................................... 27, 29

*Tobin v. Anthony-Williams Mfg. Co.,*
  196 F.2d 547 (8th Cir. 1952) ........................................................................ 24

*Vanskike v. Peters,*
  974 F.2d 806 (7th Cir. 1992) ........................................................................ 14

*Warciak v. Subway Restaurants, Inc.,*
  949 F.3d 354 (7th Cir. 2020) ........................................................................ 13

*Wisconsin Auto Title Loans, Inc. v. Jones,*
  714 N.W.2d 155 (Wis. 2006) ......................................................................... 34

*Yellow Taxi Company of Minneapolis v. NLRB,*
  721 F.2d 366 (D.C. Cir. 1983) ....................................................................... 23

**Federal Statutes**

29 U.S.C. § 203(e)(1) ...................................................................................... 14

29 U.S.C. § 206(a) ..................................................................................... 12, 14

49 U.S.C. § 14104(a) ...................................................................................... 35

49 U.S.C. § 14704(a) ...................................................................................... 36

**State Statutes**

Wis. Stat. § 104.01(2) ................................................................................ 12, 15

**Regulations**

49 C.F.R. § 376.1 ........................................................................................... 35

49 C.F.R. § 376.11(a) ..................................................................................... 35

49 C.F.R. § 376.12 ........................................................................... 4, 39–41, 43–44

## **INTRODUCTION**

Eric Brant provided over-the-road transportation for Schneider National Carriers, Inc., under an Owner-Operator Operating Agreement (the "Operating Agreement") specifying that he was an independent contractor. Brant's Operating Agreement gave him substantial authority over his own operations. He could select his own equipment and routes, although he chose to lease a truck from Schneider. He could choose to accept any job that he wanted from Schneider's online portal. And he could hire his own employees to transport freight instead of doing the job himself.

After less than a year as an owner-operator, Brant sued Schneider National Carriers, Inc., Schneider Finance, Inc., and their parent company, Schneider National, Inc. (collectively, "Schneider"), alleging that the Operating Agreement he had voluntarily entered into was in fact a "scheme to misclassify Drivers as independent contractors." He claimed that Schneider had failed to pay him the minimum wage under both the Fair Labor Standards Act and Wisconsin law, had been unjustly enriched, and had violated various provisions of the Truth-in-Leasing regulations.

The district court correctly concluded that Brant was an independent contractor. It thus dismissed each of Brant's claims. Brant acknowledges that the minimum wage does not apply to independent contractors. His own pleadings establish that he had the ability to hire his own employees to perform projects for Schneider, and had no obligation to transport freight himself. He could choose to accept or decline any jobs offered by Schneider. He could choose his own routes, and he was responsible for his own operating costs. All this pointed to independent contractor status.

As to Brant's unjust enrichment claim, he has no claim because he entered a contract that governed his relationship with Schneider. Unjust enrichment does not apply when a contract

governs the relationship between parties. While Brant does not dispute that a valid contract bars a claim of unjust enrichment, he argues that his agreement with Schneider was void or voidable because it was unconscionable. Brant's allegations in support of this claim, however, merely argue that Schneider should not have imposed costs and risks on him that are typical for an independent contractor. That a contract ended up being unprofitable or nonbeneficial to a party does not make it unconscionable.

Finally, Brant has failed to allege any violations of the Truth-in-Leasing regulations. To state a claim for a violation of the Truth-in-Leasing regulations, Brant needed to plead that he was damaged by a violation. But he has failed to identify even a single deduction or overcharge that he could have avoided but for the violations that he alleges. While Brant has also failed to plausibly allege a statutory violation, his failure to plead damages is enough to dispose of his Truth-in-Leasing claims.

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statement is complete and correct.

## STATEMENT OF ISSUES

1.      Whether Brant was an independent contractor where he had substantial authority to manage the manner in which he performed under the Operating Agreement including the ability to hire employees to transport freight and select what freight he would transport.

2.      Whether Brant's claim for unjust enrichment fails because he had a valid contractual agreement with Schneider.

3.      Whether Brant has alleged a plausible claim under the Truth-in-Leasing regulations despite explicit contractual provisions entitling him to the information he needed to

confirm his payments and his failure to point to a single charge that he could have avoided but for an alleged violation.

## **STATEMENT OF THE CASE**

### I.     **Schneider and Brant's Agreement.**

Schneider National Carriers, Inc., (SNC) is in the business of transporting freight.  SA5 ¶ 3.  This business requires SNC to retain a number of drivers to transport freight for its customers.  SA5 ¶ 4.  Schneider enters agreements with owner-operators who agree to provide transportation services for Schneider's customers as independent contractors using their own equipment.  SA5 ¶ 5.

Eric Brant provided over-the-road transportation services for Schneider National Carriers as an owner-operator from around December 2018 to around August 2019.  SA18 ¶¶ 77–78.  During this time, Brant's relationship with Schneider was governed by the Operating Agreement that described his rights and responsibilities as an owner-operator.  *Id.*[1]

The Operating Agreement provided that Brant was an "independent contractor" of SNC.  ECF No. 71-2 at 40 ¶ 24(a); ECF No. 71-3 at 39 ¶ 24(a).  SNC agreed "to make freight available" to Brant, but did not guarantee any "specific number of miles or Shipments, any specific amount of freight."  ECF No. 71-2 at 1 ¶ 1; ECF No. 71-3 at 1 ¶ 1.  Brant was "free to accept or reject Shipments" offered by SNC.  ECF No. 71-2 at 2 ¶ 1; ECF No. 71-3 at 2 ¶ 1.  He would be responsible for "the manner, means and methods of performance of all Freight Transportation Services."  ECF No. 71-2 at 2 ¶ 2(b); ECF No. 71-3 at 2 ¶ 2(b).  Brant would select and acquire

---

[1] Brant signed two different Operating Agreements during the time that he transported freight for Schneider National Carriers.  Because there are no relevant differences between the two operating agreements, they will be referred to as the "Operating Agreement."

the equipment for freight transportation, which would then be leased to SNC for the term of the Agreement. ECF No. 71-2 at 2–3 ¶ 2(b), 6 ¶ 3(a); ECF No. 71-3 at 2–3 ¶ 2(b), 6 ¶ 3(a). Brant would also select the routes for transportation of freight and be responsible for the costs of transportation. *Id.* at 3 ¶ 2(b). Schneider would remit to Brant certain payments or incentives (the "OO Payments") set forth in a fee schedule to the Operating Agreement.[2]

The Operating Agreement did not require Brant to transport the freight himself. He was required to "provide competent professional drivers" who met minimal standards. ECF No. 71-2 at 4 ¶ 2(d), ECF No. 71-3 at 4 ¶ 2(d). Brant was responsible for the "wages, hours, meal, and rest breaks, working conditions, management, [and] supervision" of himself or any employees that he hired. ECF No. 71-2 at 2 ¶ 2(b), ECF No. 71-3 at 2 ¶ 2(b).

The Operating Agreement also permitted Brant to work for other carriers in some circumstances. Brant could use the equipment that he leased from SNC to work for other entities, so long as he first obtained written permission from SNC. ECF No. 71-2 at 6–7 ¶ 3(b); ECF No. 71-3 at 6–7 ¶ 3(b).[3]

Although Brant was responsible for his own operating costs, the Operating Agreement included terms that allowed Schneider to assist him with those costs and deduct them from his OO Payments if Brant selected this option, which he had no obligation to do. For example, Brant

---

[2] The OO Payments are based primarily on a percentage of revenue generated from linehaul charges generated from Brant's transporting of freight plus flat fee payments for additional services or delays.

[3] The requirement that Brant obtain permission to drive for another carrier is required by U.S. Department of Transportation regulations, specifically, 49 C.F.R. § 376.12(c)(1). The Operating Agreement specifically states, "Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether Owner-Operator or its drivers are an independent contractor or an employee of Carrier." ECF No. 71-2 at 6–7 ¶ 3(b); ECF No. 71-3 at 7 ¶ 3(b).

could choose to use fuel cards provided by Schneider. ECF No. 71-2 at 13–14 ¶ 6(c); ECF No. 71-3 at 14 ¶ 6(c). Schneider would then charge the costs of fuel against Brant's OO Payments. *See id*.

While the Operating Agreement provided that Brant was in charge of selecting and obtaining his own equipment, Schneider Finance offered to lease a truck to Brant. SA16 ¶ 62. Brant chose to lease a truck from Schneider Finance. SA18 ¶ 77.

Brant signed a Lease that required no down payment and no initial security deposit. ECF No. 71-4 at 1. It required payments of $843.42 each week. ECF No. 71-4 at 11. Brant would also be required to pay a security deposit of $1,000 through periodic payments of $100. *Id*.

Because Schneider agreed to advance some of Brant's costs, the Operating Agreement and Lease included a detailed table describing the charges that could be deducted from Brant's OO Payments. *See* ECF No. 71-2 at 64–68; ECF No. 71-3 at 64–68. This table provided the actual amount that would be charged for fixed fees and described how variable fees would be calculated. *Id*. It also required Schneider to "provide a copy of the rated freight bill (or a computer-generated summary) to [Brant] for those Shipments on which [Brant]'s linehaul payment is based on a percentage of revenue." ECF No. 71-2 at 8 ¶ 4(e); ECF No. 71-3 at 8 ¶ 4(e). It further provided that Brant "shall have the right to examine copies of [Schneider]'s tariffs at [Schneider]'s home office during reasonable business hours." *Id*. Each payment to Brant would be "supported by a statement providing, in reasonable detail, the calculations used in determining the . . . Payments owed to [Brant] and any deductions." *Id*. at 7–8 ¶ 4(c).

## II.     Brant's Allegations.

In July 2020, Brant filed a complaint against Schneider National Carriers, Schneider Finance, and their parent company, Schneider National, Inc. alleging a failure to pay the minimum wage under the Fair Labor Standards Act and Wisconsin state law, unjust enrichment, and violations of the Truth-in-Leasing regulations.  ECF No. 1.  Schneider moved to dismiss the complaint for failure to state a claim pursuant to Fed R. Civ. P. 12(b)(6).  ECF No. 20.  The district court granted Schneider's motion, but granted Brant leave to amend his complaint in 30 days.  A1–16.

Brant filed his First Amended Complaint on February 18, 2021.  His First Amended Complaint alleged that the Schneider had engaged in a scheme to "misclassify" Brant and other owner-operators as independent contractors instead of employees.  SA5.

In the First Amended Complaint, Brant alleged that Schneider had induced him and other owner-operators to enter the Operating Agreement by offering to lease trucks to them without requiring any money down and offering to use Schneider credit to advance the costs of operation.  SA16 ¶¶ 62–63.  He claimed that the Operating Agreement and Lease were presented as a single, non-negotiable package prepared by Schneider.  SA17–18 ¶¶ 72–76.  Although the documents totaled over 100 pages, he alleged that he and other owner-operators were not given adequate time to review the terms or permitted to consult with an attorney.  *Id.*

Brant's First Amended Complaint acknowledged that the Operating Agreement classified him and other owner-operators as independent contractors.  SA16 ¶ 60.  But Brant alleged that this classification did not represent the actual relationship between him and Schneider.  SA19–20 ¶¶ 82–89.

6

Brant alleged that Schneider "controlled the manner" in which he transported freight. SA19 ¶ 83. In support of this allegation, Brant asserted that the Operating Agreement required him to comply with Schneider's policies and procedures and with the instructions of Schneider's customers. SA19 ¶ 83. He admitted that the Operating Agreement permitted him to choose his routes, fuel, and rest stops. SA22 ¶ 99. But he alleged that this ability was curtailed "[a]s a practical matter" by the pick-up and delivery times arranged between Schneider and its customers and the need to obtain fuel on Schneider's credit. *Id.* Brant similarly acknowledged that he was responsible for selecting the equipment that he would use. He asserted, however, that this did not give him "meaningful control" over his work because he purchased the items through Schneider or an entity approved by Schneider and he was dependent on Schneider's credit. SA23 ¶ 101.

Brant also alleged that Schneider maintained control over his potential earnings. Brant alleged that Schneider had discretion over whether to offer a load to him. SA19 ¶ 85. It also set the price for the loads that it offered. *Id.* ¶ 86. According to Brant, this meant that he and other owner-operators were as dependent on Schneider as the drivers that Schneider employed. SA20 ¶ 90. He recognized that the Operating Agreement gave him and other owner-operators "the ability to decide when they would work." SA21 ¶ 97. But he alleged that it was "very difficult . . . to take time off from work" because of the weekly lease payments. *Id.*

While Brant acknowledged that the Operating Agreement allowed him to transport freight for other customers with Schneider's permission, he pointed out that it did not require Schneider to grant permission. SA19 ¶ 87. He alleged that Schneider had told him that it "did not permit" its owner-operators "to drive for other carriers." SA20 ¶ 88. He also alleged that the Operating Agreement's conditions made driving for another carrier "practically impossible." *Id.* ¶ 89.

Brant also recognized that he had the ability to hire a substitute driver, but he argued that this right provided him with "no benefit." SA23 ¶ 100. Hiring another driver "meant sharing the amounts paid . . . with another person." *Id.* And he would still be "dependent on Schneider to offer sufficient profitable loads." *Id.*

Brant next alleged that he and other owner-operators had no investment in their trucks and lacked special skills. Starting with investment, Brant alleged that he had no investment in the trucks because payments and operating costs were deducted from his weekly earnings after being advanced by Schneider. SA23–24 ¶ 102. Turning to skill, he argued that the "only 'skill'" he and other owner-operators had was the ability to operate large trucks to transport freight using a commercial driver's license. SA24 ¶ 103.

Brant also alleged that, while each Operating Agreement was for a limited term, Schneider intended to form a permanent relationship with owner-operators. SA24–25 ¶¶ 107–109. Schneider "routinely renewed" its agreements with owner-operators. SA24 ¶ 108. And the leases for the trucks offered by Schneider had "a longer term than the Operating Agreement," but termination or expiration of an Operating Agreement would result in a default on the lease. SA25 ¶ 109.

Brant brought four claims against Schneider. His first two claims alleged violations of the Fair Labor Standards Act and Wisconsin's minimum wage law. Brant alleged that he was an employee, not an independent contractor, of Schneider, and his pay after deductions failed to meet the minimum wage. SA36–37 ¶¶ 164–78.

Brant's third claim alleged that Schneider had been unjustly enriched by the pay that they withheld from Brant. He did not allege that the deductions were not provided for in the Operating

8

Agreement and Lease. But he argued that the Operating Agreement and Lease were void or voidable because they were unconscionable. SA38 ¶¶ 179–83.

Brant's fourth claim alleged three violations of the Truth-in-Leasing regulations. First, he alleged that Schneider had failed to provide him with a copy of the rated freight bill or other documentation containing the same information when it was required by those regulations. SA38–39 ¶¶ 184–87. Second, he alleged that Schneider had failed to provide documents showing how deductions from his pay had been computed. *Id.* Third, he alleged that Schneider had failed to specify the amount of all escrow funds. *Id.*

## III.    The District Court's Opinion.

The district court dismissed Brant's First Amended Complaint for failure to state a claim. A17–18. The court noted that the First Amended Complaint had added "new factual allegations," but concluded those allegations "do not cure the inadequacies noted" in the court's dismissal of the first complaint. A18. Thus, the court dismissed the First Amended Complaint "for the same reasons set forth in" its first "decision and order granting Defendants' motion to dismiss." *Id.*

In its first order, the court had dismissed Brant's FLSA and Wisconsin statutory claims because "Brant was properly classified as an independent contractor and, thus, those laws do not apply." A4. The court first noted that the amount of control exercised by Schneider supported Brant's classification as an independent contractor. A7. It noted that the Operating Agreement gave Brant the right to select his own equipment, accept and reject work offered by Schneider, and accept work from other companies. *Id.* And the court placed particular emphasis on Brant's ability to "hire his own employees," and that he "wouldn't be required to do any of the actual transportation himself." *Id.*

The court also found that Brant's responsibility for his own profitability supported his classification as an independent contractor. A8–9. The court noted that the Operating Agreement permitted Brant to drive for other customers with the consent of Schneider. A9. The Operating Agreement also made Brant the "sole person in control of how many loads he decided to take, how often he drove (subject to federal regulations), and whether or not he chose to employ additional drivers to increase profits." *Id.*

The court next concluded that Brant's investment in his equipment supported classification as an independent contractor. A9–10. It noted that, under the Operating Agreement, "Brant was fully empowered to buy or lease his equipment from any provider, and he was not required to lease his equipment from Defendants." A9. The district court rejected Brant's argument that he had not invested in his equipment because he had obtained it through Schneider. The court explained that "[e]ven if Defendants were, in effect, his only option from which to buy or lease equipment, Brant was still required . . . to take on considerable financial risk in order to operate the equipment and to cover operating expenses." A10.

Finally, the court found that the special skills involved and the temporary nature of the relationship supported Brant's classification as an independent contractor. A10–11. The court explained that "driving [a] commercial truck is a special skill." A10. And it concluded that the temporary nature of the fixed one-year term provided by the Operating Agreement suggested independent contractor status. A10–11.

The court found that one factor—whether the service rendered by Brant was essential to Schneider's business—weighed in favor of classifying Brant as an employee. The court explained

that it was "clear that commercial truck driving is integral to Defendants' operation and business." A11. But it also found that this factor was "hardly controlling." *Id.*

The court also concluded that Brant had failed to plead a claim for unjust enrichment under Wisconsin law. A11–12. Ordinarily the doctrine of unjust enrichment does not apply when the parties have agreed to a contract. A12. To avoid the application of this rule, Brant argued that the Operating Agreement and Lease were void or voidable because they were unconscionable. *Id.* The district court, however, dismissed that argument, explaining that "[o]ther than asserting that misclassifying the drivers as independent contractors rendered the agreements unconscionable, Brant has not alleged facts from which it could be inferred that the [Operating Agreement] and Lease are void or unenforceable." *Id.*

Finally, the district court concluded that "Brant's TILA claim must also be dismissed." A12. To begin, the court explained that Brant's TILA claim required him to show how he sustained damages as a result of the alleged violations. A13. The First Amended Complaint included "no allegations . . . identifying the actual harm Brant and the other drivers suffered or plausibly suggesting that they were injured as a result of any alleged TILA violation." A14. That failure alone was enough to support dismissal of his TILA claim. *Id.*

Even without his failure to allege damages, the district court found that Brant had failed to plead a TILA violation. It explained that TILA requires only disclosure of how the amount of each item is to be computed, and the Operating Agreement explained how the amounts charged back to drivers would be computed. A14. While Brant alleged that Schneider had failed to provide freight bills or allow examination of tariffs, the district court noted that he did not allege that he had sought this information and been denied the opportunity to review it. A15. And the district

11

court rejected Brant's assertion that the Lease failed to specify the amount of the additional security deposit because "Appendix A to the Lease states the amounts of applicable security deposits." *Id.*

Brant appealed.

## SUMMARY OF ARGUMENT

**I.**    Neither the minimum wage provisions of the FLSA nor Wisconsin's minimum wage law apply to Brant. These laws reach only "employees," not independent contractors. *See* 29 U.S.C. § 206(a); Wis. Stat. § 104.01(2)(a). But the allegations in Brant's First Amended Complaint and the terms of the Operating Agreement and Lease confirm that Brant was an independent contractor. He maintained extensive control over the manner in which he transported freight, including the ability to choose routes and schedules. His own allegations confirm that he had made a substantial investment in his operations through the Lease and various other payments that he made for operating costs. He engaged in skilled labor on a short-term basis. And perhaps most importantly, he had the ability to hire his own employees, and he never had to transport the freight himself. This amount of control and investment is consistent only with independent contractor status.

Despite the extensive control exercised by Brant, he argues that this Court should reverse because the district court relied on the terms of the Operating Agreement in dismissing his complaint. But he fails to identify any reliance on the terms of the Operating Agreement that would change the conclusion that he is an independent contractor. He points to his allegation that Schneider told him that it would not grant permission to work for another character. But even assuming that Brant's conclusory allegation was sufficient, a number of other factors relied

12

on by the district court—including Brant's ability to hire his own employees and never transport freight himself—confirm that he was an independent contractor.

**II.**     Brant's unjust enrichment claim fails because he agreed to a contract that governed his relationship with Schneider. *See Cont'l Casualty Co. v. Wisconsin Patients Comp. Fund*, 473 N.W.2d 584, 587 (Wis. App. 1991). Brant does not dispute that a valid contract bars an unjust enrichment claim, but he argues that the Court should disregard his agreement with Schneider because it was unconscionable. His argument for unconscionability, however, focuses on allegations that he agreed to burdens and risk that are typical for an independent contractor. Since these ordinary terms of an independent contractor arrangement are not unconscionable, Brant's unjust enrichment claim fails.

**III.**     Finally, Brant has failed to allege any valid claim under the Truth-in-Leasing regulations. *Fulfillment Servs. Inc. v. United Parcel Serv., Inc.*, 528 F.3d 614, 621 (9th Cir. 2008). Brant alleges three violations of the Truth-in-Leasing regulations, but the Operating Agreement, Lease, and Brant's First Amended Complaint refute each of these claims. More importantly, Brant cannot bring a Truth-in-Leasing claim without showing damages. But he has failed to identify any specific charge or deduction that he could have contested but for Schneider's alleged violation of the Truth-in-Leasing regulations. In the absence of a single charge or deduction that he would have challenged, Brant has failed to allege a violation of the Truth-in-Leasing regulations.

## **STANDARD OF REVIEW**

This Court reviews the dismissal of a complaint for failure to state a claim *de novo*. *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 356 (7th Cir. 2020). To state a claim, the complaint

must include "enough facts to state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility means "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## <u>ARGUMENT</u>

### I.    Brant failed to plead that he was an employee of Schneider.

Both the FLSA and Wisconsin's minimum wage law apply only to an employer-employee relationship. The FLSA's minimum wage provision requires "[e]very employer" to pay "each of his employees" the minimum wage. 29 U.S.C. § 206(a). But it defines "employee" to "mean[] any individual employed by an employer." 29 U.S.C. § 203(e)(1). This Court has looked to the "economic reality" to decide whether someone is an "employee" for the purpose of the Fair Labor Standards Act. *Sec'y of Labor, U.S. Dep't of Lab. v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987). "[C]ourts have developed a variety of multifactor tests" to determine when the economic reality makes someone an employee. *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 290 (7th Cir. 2016). While no "specific test" governs in all situations, *id.* at 291 (quoting *Vanskike v. Peters*, 974 F.2d 806, 809 (7th Cir. 1992)), this Court frequently looks to the following six criteria:

1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

4) whether the service rendered requires a special skill;

5) the degree of permanency and duration of the working relationship;

6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Lauritzen*, 835 F.2d at 1534–35.

Wisconsin's minimum wage law defines an "employee" as "every individual who is in receipt of or is entitled to any compensation for labor performed for any employer." Wis. Stat. § 104.01(2)(a). An individual is not an "employee" under Wisconsin's minimum wage law if "that individual is exempt . . . from being paid at least the federal minimum hourly wage under 29 U.S.C. § 206(a)(1)." *Id.* § 104.01(2)(b)(3).

**A.    The *Lauritzen* factors confirm that Brant was an independent contractor.**

**1.    Brant's extensive control over the manner in which he performed his work—including his ability to hire others to perform that work—supports independent contractor status.**

Brant's control over the manner in which he performed his work, and Schneider's lack of control, weigh in favor of his classification as an independent contractor. To begin, the Operating Agreement recognizes that Brant "shall determine the manner, means and methods of performance of all Freight Transportation Services." A6. Consistent with this provision, the Operating Agreement grants Brant a number of specific rights that allow him to control the manner in which he provides freight transportation services. For example, Brant was responsible

for "selecting, purchasing, leasing, financing, maintaining, operating, and insuring" the equipment that he used for transporting freight. ECF No. 71-2 at 2–3 ¶ 2(b); ECF No. 71-3 at 2–3 ¶ 2(b); *see also* A6. He was also responsible for selecting all routes and for weighing, inspecting, and measuring all shipments. *Id.* at 3 ¶ 2(b); *see also* A6. And he was responsible for his fuel and costs of transportation over the routes he selected. *Id.*; *see also* A6. Each of these rights gave Brant substantial control over the manner in which he transported freight for Schneider.

Moreover, Brant's ability to hire his own employees to transport freight weighs heavily in favor of the conclusion that he exercised control over the manner of performing his work consistent with an independent contractor. Under the Operating Agreement, Brant could hire drivers and other employees. ECF No. 71-2 at 4 ¶ 2(d); ECF No. 71-3 at 4 ¶ 2(d); A7. In fact, the Operating Agreement did not even require that Brant transport any freight himself. *Id.*

Brant's ability to hire other drivers to transport freight on his behalf is inconsistent with classification as an employee. For this reason, the district court noted that it was "unaware" of "any traditional employer-employee relationship . . . where an employee can contract with a third party to perform the actual work of the employer." A7 (quoting *Derolf v. Risinger Bros. Transfer, Inc.*, 259 F. Supp. 3d 876, 880–81 (C.D. Ill. 2017)).

The district court relied on these factors to conclude that Brant was an independent contractor, giving particular attention to Brant's ability to hire his own employees. But Brant fails to even address these factors in his argument that Schneider exercised "detailed control of the manner and means" of operations. Brief of Plaintiffs-Appellants (Appellants' Opening Br.), Dkt. 24 at 19. Instead, he points to other allegations—including that Schneider required him to follow rules and procedures, monitored drivers, required drivers to take specific loads, and could terminate

the contract at-will—to argue that Schneider controlled the manner of his performance. *Id*. at 19–21.

None of the factors cited by Brant support the conclusion that Brant was Schneider's employee. Brant relies most heavily on the fact that the parties could terminate the contract at will. But most of Brant's authorities illustrate that at-will status has only a weak connection to control that does not suggest an employment relationship. For example, Brant cites to the Ninth Circuit's statement in *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014) that at-will status is evidence of an employment relationship. But that decision recognized that at-will status is a "secondary" indicator that courts look to under California law in addition to the extent of the employer's control. *Id*. This treatment as a secondary indicator hardly supports the conclusion that at-will status shows control. In any event, the Ninth Circuit has instructed that a "mutual termination provision is consistent with either an employer-employee or independent contractor relationship." *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1105 (9th Cir. 2014). And in *Doty v. Elias*, 733 F.2d 720, 723 (10th Cir. 1984), the Tenth Circuit first assessed control before listing facts that spoke to four additional factors including "the permanence of the working relationship." The trial court's brief reference to the "power to fire plaintiffs at will" in that discussion is best read to refer to the permanence of the relationship. *Id*.

Turning to Brant's allegation that Schneider required him to follow certain rules and procedures and monitored his behavior, the allegations in the First Amended Complaint show the limited nature of Schneider's oversight. Brant alleged that Schneider required him to follow its "policies and procedures" and "requirements of [Schneider]'s customers." SA19 ¶ 83. He alleges that these rules covered "where to park a truck, how and when locks must be placed on trailers,

17

whether and when [the driver] must stay with [a] truck, how to load and unload trailers, how to pick up and deliver loads, and how to hire extra help with loading and unloading." SA26 ¶ 122. He also alleged that the rules addressed his "appearance and demeanor." *Id.* He claims that Schneider "monitored the way" he drove including "speed, location, hard-braking incidents and other critical driving events," and required him "to drive no more than 70 mph." SA27 ¶¶ 123–24. He concedes that he had the ability to select his own routes, but argues that "the pick-up and delivery times negotiated by [Schneider]," his "need to keep operating costs at a minimum," and his "need to follow routes where [he] could obtain fuel on [Schneider's] credit" meant that he actually had "no choice" of routes. SA22 ¶ 99.

This limited framework of rules and oversight does not suggest the kind of control that would establish an employer-employee relationship. "[M]eeting clients' specifications and keeping clients informed . . . is consistent with the 'usual path' of an [independent contractor]." *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 382 (5th Cir. 2019) (quoting *Scantland v. Jeffrey Knight, Inc.*, 721 F.3d 1308, 1315 (11th Cir. 2013)). For this reason, courts have held that the ability to control the manner and means of performance weighs in favor of independent contractor status even when a client provides detailed instructions. For example, the Fifth Circuit recently found that the control exercised by a group of directional-drilling consultants weighed in favor of a finding that they were independent contractors even though they were required to comply with company policies procedures, lacked control over their own schedule, and had to submit reports in the company's preferred format. *Parrish*, 917 F.3d at 381–82. The mandated reports, the Court explained, were "good-client service." *Id.* at 382. While the consultants could not keep their own schedule, they were not required to accept any projects. *Id.* The Court reasoned that since the

company "did not dictate how plaintiffs completed the directional-drilling calculations" the control exercised by the consultants weighed in favor of independent contractor status. *Id.* at 381.

> **2.    Brant's ability to set his own schedule and routes and to manage his own employees illustrates that his profit or loss depended on his managerial skills.**

Brant's opportunity for a profit or loss depending on his managerial skills also weighs in favor of his classification as an independent contractor. He had the ability to accept or decline any shipment posted on Schneider's online portal. ECF No. 71-2 at 1–2 ¶ 1 & 62; ECF No. 71-3 at 1–2 ¶ 1 & 62. When he chose to accept a shipment, he was responsible for selecting the routes, schedule, and other logistics for the shipment. ECF No. 71-2 at 2–3 ¶ 2(b)(i), (iii), (iv); ECF No. 71-3 at 2–3 ¶ 2(b)(i), (iii), (iv). The Operating Agreement permitted him to work for other carriers with Schneider's permission. And it permitted him to hire other drivers and other employees to help him transport more freight. ECF No. 71-2 at 3 ¶ 2(b); ECF No. 71-3 at 3 ¶ 2(b).

Courts have recognized that the kind of control exercised by Brant gives a driver control over his ability to make a profit or loss. For example, the Fifth Circuit has found that this factor weighed in favor of independent contractor status because a "driver's profit or loss is determined largely on his or her skill, initiative, ability to cut costs, and understanding of the courier business." *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 304 (5th Cir. 1998). The Court found that the drivers' ability to control their profits was "especially true because the drivers had the ability to choose how much they wanted to work and the experienced drivers knew which jobs were most profitable." *Id.* More recently, the Second Circuit has held that drivers' "flexible work schedules and considerable control over when, where, and in what circumstances to accept a

. . . fare" that "resulted in wide disparities in gross earnings for rides provided through Defendants" weighed in favor of independent contractor status. *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 147 (2d Cir. 2017).

Brant argues that he lacked control over his profit or loss because logistical and financial considerations pressured him toward one decision. Appellants' Opening Br. at 21–24. For example, he argues that his control over routes and break times was "meaningless" because he had to meet pick-up and delivery times established by Schneider. *Id.* at 22. He insists that his ability to turn down loads or choose when to work was "similarly illusory" because he had no way of knowing what loads would be offered in the future. *Id.* at 22–23. And he argues that his ability to hire a driver was "meaningless" because the Operating Agreement did not require Schneider to guarantee him enough loads to keep that driver busy. *Id.* at 23.

But facing pressure to choose one path instead of another is an ordinary feature of operating one's own business as an independent contractor. For this reason, courts have rejected arguments that an individual should be classified as an independent contractor when he faces these kinds of economic pressures. For example, the Fifth Circuit found that a driver's ability to set his own schedule meant that the ability to control profit or loss weighed in favor of independent contractor status even though he did not control "customer volume and the amount charged to customers." *Herman*, 161 F.3d at 304. And the Second Circuit held that the ability to accept or reject jobs weighed in favor of independent contractor status "despite the penalty of being placed at the end of the queue." *Saleem*, 854 F.3d at 147.

As in those decisions, Brant retained discretion over a number of key factors that would determine his ability to make profit or loss including the ability to set his own schedule, accept or

20

reject work, and choose work based on the needs of his business. Thus, the mere fact that the potential consequences of his decision made one path more attractive does not undermine classification as an independent contractor.

Brant points to allegations that Schneider told him that he could not work for other carriers and forced him to haul certain loads. Appellants' Opening Br. at 22–23. But even without the ability to work for different carriers or an unfettered ability to turn down loads, Brant still retained the ability to make a profit or loss depending on his management skills. For example, Brant's argument does not speak to his ability to retain employees to work for him and select routes to minimize costs.

### 3. Brant's extensive investment to lease a truck and cover operating costs supports his classification as an independent contractor.

Brant's investment in the tools required for his work weighs heavily in favor of independent contractor status. The Operating Agreement made Brant responsible for "[s]electing, purchasing, leasing, financing, maintaining, operating, and insuring the Equipment." ECF No. 71-2 at 2; ECF No. 71-3 at 2. To fulfill these provisions, Brant leased a truck from Schneider. The Lease required weekly payments of $843.42, or nearly $44,000 each year. *See* SA21 ¶ 92; ECF No. 71-4 at 11. The Operating Agreement also required Brant to pay his own operating expenses. ECF No. 71-2 at 3 ¶ 2(b)(iv); ECF No. 71-3 at 3 ¶ 2(b)(iv).

This kind of investment supports Brant's classification as an independent contractor. A "driver's investment of a vehicle is no small matter." *Herman*, 161 F.3d at 304; *see also State Comp. Ins. Fund v. Brown*, 32 Cal. App. 4th 188, 203, 38 Cal. Rptr. 2d 98, 105 (1995), *as modified* (Feb. 8, 1995) ("The independents make the capital investment in their trucks, which is a substantial

investment beyond the provision of their labor.").  And it is a substantial investment regardless of whether the vehicle is purchased or leased.  *See Saleem*, 854 F.3d at 145.  The same is true for "fuel, repair, and maintenance, license, registration, and insurance fees, and tolls, parking, and tickets." *Saleem*, 854 F.3d at 145.

In fact, Brant's First Amended Complaint relied on the substantial financial commitment that Brant made under the Operating Agreement and Lease.  Brant alleges that his "fixed costs, including weekly Lease payments and advances each week" pressured him to accept loads.  SA21 ¶ 92.  And he even alleges that the costs that he accepted under the Operating Agreement and Lease "shift[] the risk of trucking business downturns" to him.  SA29 ¶ 142.

Despite his allegations, Brant now argues that he had no substantial investment in the business.  To support this argument, he cites to allegations that his truck and other operating costs were funded through Schneider's credit and deducted from his pay.  Appellants' Opening Br. at 24–25.  According to Brant, this arrangement means that the funds he spent to pay for equipment were "not the investment of an independent contractor."  *Id.* at 24.

But the fact that Brant funded his investment through deductions from his OO Payments does not mean that he made no investment.  It makes little sense to discount the substantial investments that Brant made in his equipment and operating costs merely because of the mechanism through which he funded those investments.  And Brant has no explanation for why the mechanism through which he obtained and paid for his truck and other operating costs means that those payments were not an investment.  As the district court noted, even if the financial commitments required from Brant were unfair, "there is little question" that Brant had been required "to take a huge risk" by investing these funds in his operations.  A10.

The D.C. Circuit has explained that it is the amount paid toward equipment and operations, not the manner in which those payments are made, that decides whether a driver has made a substantial investment.  In *Yellow Taxi Co. of Minneapolis v. NLRB*, 721 F.2d 366 (D.C. Cir. 1983), that Court rejected an argument that taxi cab drivers had no investment in their cab because they had no equity and could be reassigned to a different cab.  721 F.2d at 380.  The Court explained that the payment of a "sum of money" that "cannot be considered as anything less than a substantial investment" defeats an argument that "the lessee drivers have *no investment* in the instrumentalities of their work."  *Id.* at 380 (quoting *Loc. 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. NLRB*, 603 F.2d 862, 898 (D.C. Cir. 1978)).  Drivers who make "an annual investment of $10,000, excluding the cost of gasoline . . . are not to be characterized as employees who make no entrepreneurial contribution and take no financial risk in their work."  *Id.*

None of the decisions cited by Brant show that there is no investment when lease payments and other operating costs are deducted from payments.  *See* Appellants' Opening Br. at 24–25.  Several of those decisions apply different legal tests that do not ask whether an individual has made an "investment."  For example, *Ruiz* found that a business had "provided" the tools required when it leased a truck and other tools to an individual under California law.  *Ruiz*, 754 F.3d at 1104.  The Sixth Circuit's decision in *Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793 (6th Cir. 2015), similarly applied a state law standard that does not inform the FLSA inquiry.  The Sixth Circuit found that a truck leasing program supported the conclusion that a driver did not maintain a separate business under a Michigan statute.  *Max Trucking*, 802 F.3d at 805.  But the Court never addressed whether this lease was a substantial investment.  *Id.*  Finally, the

unpublished district court decision in *Doe v. Swift Transp. Co.*, No. 2:10-cv-00899, 2017 WL 67521 (D. Ariz. Jan. 6, 2017), fails to even identify the standard that it applies, s*ee* 2017 WL 67521, at *4, and it never says whether lease payments made through pay deductions are an investment, *id.* at *6.

The other cases relied on by Brant point to the minimal investment by the alleged contractors. *Donovan v. Sureway Cleaners*, 656 F.2d 1368 (9th Cir. 1981), for example, involved a scheme to make a minimal investment in a dry-cleaning business look more substantial. After a district court concluded that Sureway's "agents" who operated individual stores were employees, Sureway changed its contract from one that required a payment of $1 for rent and use of fixtures each week to one that charged a total weekly fee of $48.50. *Sureway Cleaners*, 656 F.2d at 1370 & 1372 n.9. At the same time, Sureway increased the percentage of the "agent's" take on the first $100 of business each week by $47. *Id.* at 1372 n.9. Based on that arrangement, the Ninth Circuit concluded that it was Sureway that was making the investment. Similarly, in *Tobin v. Anthony-Williams Mfg. Co.*, 196 F.2d 547 (8th Cir. 1952), truck drivers agreed to "purchase" their trucks from a lumber producer and pay through $2 dollar deductions on each thousand board feet hauled. *Tobin*, 196 F.2d at 548. Most of the drivers gave no down payment, none of them agreed to pay for the truck "in any specified time," and the truck could "be used only in connection with the business of" the lumber producer. *Id.* at 548–49. Based on this arrangement that required no payments on any timeline, the Eighth Court found that the drivers had "no substantial investment in their trucks, and their ownership is no more than nominal." *Id.* at 550.

Finally, Brant argues that this factor should weigh in his favor because any investment that he made would be "insignificant" compared to Schneider's investment. Appellants' Opening Br.

at 25–26.  But this does not alter the fact that Brant made a substantial investment in his performance under the Operating Agreement.

This Court has noted the "disproportionately small stake" of migrant workers whose only purchase was their own gloves in *Lauritzen*, 835 F.2d at 1537, and other courts have relied on a comparison between the investment of a purported independent contractor and the business he works for, *see Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998).  But *Lauritzen* involved an investment where the workers' "disproportionately small stake" was the result of the negligible investment they had made.  835 F.2d at 1537.  When an alleged independent contractor makes the kind of substantial investment in this case, a comparison of investments will not indicate whether the alleged contractor functioned as an independent entity.  Instead, it would speak only to the size of the company that he worked for.

4. **The skill required for Brant to perform under the Operating Agreement weighs in favor of independent contractor status.**

The special skill required to transport freight supports Brant's classification as an independent contractor.  Transporting freight with a commercial truck is a special skill that requires a commercial driver's license.  "[T]ruck driving . . . requires abilities beyond those possessed by a general laborer (or, indeed, possessors of ordinary driver's licenses)." *Brown*, 32 Cal. App. 4th at 202–03.  The requirement of a special certification or license, like a commercial driver's license, illustrates that a job requires special skills.  *See Keller v. Miri Microsystems LLC*, 781 F.3d 799, 809 (6th Cir. 2015) (citing a requirement to obtain certification).

Brant does not dispute that truck driving is a special skill.  Instead, he argues that that this skill is "the same skill possessed by Schneider's employee drivers." Appellants' Opening Br. at 26.

For this reason, Brant insists that the skill required for the job could weigh in favor of employee status. *See id.*

The question for the purpose of classification as an independent contractor is not whether employees have the same skills. This Court has acknowledged that "[s]kills are not the monopoly of independent contractors." *Lauritzen*, 835 F.2d at 1537. A business's decision to hire skilled employees does not convert similarly skilled contractors into employees. Instead, the question remains whether the "service rendered requires a special skill." *Id.* at 1535.

Moreover, Brant's ability to drive a commercial truck was not the only special skill required for his performance under the Operating Agreement. The Operating Agreement also made Brant responsible for overseeing his own operations. This responsibility included deciding which shipments to select, choosing the routes, managing his own equipment, and overseeing any employees that he chose to hire. ECF No. 71-2 at 2–3 ¶ 2(b); ECF No. 71-3 at 2–3 ¶ 2(b). These skills required for his performance under the Operating Agreement also weigh in favor of independent contractor status.

> ### 5. The temporary nature of Brant's contract suggests that he was an independent contractor.

The temporary nature of Brant's relationship with Schneider weighs in favor of classification as an independent contractor. Courts applying the FLSA have recognized that "'[i]ndependent contractors' often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of indefinite duration." *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1236 (10th Cir. 2018) (quoting *Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989)).

Similarly, this Court has held—outside the FLSA context—"that where a person is engaged to work for a company for a limited period of time with no expectation of contract renewal, that fact favors independent contractor status." *Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 567 (7th Cir. 2009).

Brant's agreements with Schneider were for a "fixed term" of no more than one year. ECF No. 71-2 at 37; ECF No. 71-3 at 36. They expressly provided that they would "not automatically renew." *Id.* Instead, the parties would have to "enter into another fixed term agreement" if they wanted to continue their relationship. *Id.* Thus, the Operating Agreement established a "fixed employment period[]," not a relationship of "continuous and indefinite duration." *Acosta*, 884 F.3d at 1236; *see also Derolf*, 259 F. Supp. 3d at 883.

Brant argues that this one-year fixed term was long enough to support classifying him as an employee. But this Court has recognized that similar periods support independent contractor status. In *Estate of Suskovich*, Suskovich had worked for a company for a "substantial period of time," but he "was only engaged for short projects, usually lasting six to twelve months." 553 F.3d at 568. He also "never enjoyed any guarantees that his work would extend beyond this limited duration." *Id.* This Court found that "this factor favors independent contractor status." *Id.*

While *Estate of Suskovich* distinguished this Court's suggestion in *Lauritzen* that permanence might weigh in favor of employee status for seasonal employees on the ground that it was an application of the FLSA, *Lauritzen*'s assessment of permanence did not turn on anything distinctive about the FLSA. Instead, it focused on the seasonal nature of pickle farming. *See Lauritzen*, 835 F.2d at 1537. The Court noted that "[m]any seasonal businesses necessarily hire only seasonal employees, but that fact alone does not convert seasonal employees into seasonal

independent contractors." *Id.* at 1537. It suggested that even temporary employment might be "permanent and exclusive for the duration of that harvest season." *Id.* In any event, *Lauritzen* never reached a holding on permanence. Since permanence had not been dispositive, this Court concluded that it "need not disturb" the district court's finding that the relationship was not permanent. *Id.*

In contrast with these decisions, Brant points to two out-of-circuit precedents to suggest that a one-year term suffices to establish permanence. Appellants' Opening Br. at 27. But, like *Lauritzen*, both of those decisions turned on the inherently temporary nature of the work at issue. The Tenth Circuit's decision in *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998), acknowledged that the short durations of the agreements were "generally typical of independent contractors." But because those short terms were "clearly due to the intrinsic nature of oil and gas pipeline construction," it found that the relationship was "permanent and exclusive for the duration of the particular job." *Baker*, 137 F.3d at 1442. Similarly, the Fifth Circuit's decision in *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 60–61 (5th Cir. 2009) found that an eleven-month period of exclusive work could support employee status when a temporary arrangement was inherent in the "nature of the emergency restoration work" at issue. But since work in the trucking industry is not seasonal, those decisions have no application here.

Brant argues that the degree of permanence weighs in favor of classifying him as an employee because Schneider expected him to renew the Operating Agreement and his lease lasted longer than the Operating Agreement. Appellants' Opening Br. at 41. But a mere expectation that an agreement might be renewed is not enough to show that a relationship has the kind of permanence associated with employment. This Court has found that the absence of "any

guarantees that . . . work would extend beyond [a] limited duration . . . favors independent contractor status." *Estate of Suskovich*, 553 F.3d at 568. So the absence of any assurance that Brant's relationship with Schneider would extend beyond the fixed term of the Operating Agreement supports his classification as an independent contractor.

In fact, Brant's own authorities support the conclusion that his Operating Agreement for a limited term that did not automatically renew weighed in favor of independent contractor status. The agreements in each case relied on by Brant provided for automatic renewal. *See Alexander*, 765 F.3d at 996 (explaining that the agreement "provides for automatic renewal for successive one-year terms"); *Narayan v. EGL, Inc.*, 616 F.3d 895, 902–03 (9th Cir. 2010) (noting that the agreements "contained automatic renewal clauses"); *Swift Transp.*, 2017 WL 67521, at *5 (D. Ariz. Jan. 6, 2017) (noting that the agreements "automatically extends year to year"). These automatic-renewal provisions indicated that the relationship had an "indefinite nature." *Alexander*, 765 F.3d at 996 (quoting *Narayan*, 616 F.3d at 903). In contrast, Brant's Operating Agreement specifically provided that it would not automatically renew.

### 6. Brant's involvement in work essential to Schneider's business does not undermine independent contractor status.

The final factor that this Court has looked to—the extent to which the service rendered is integral to Schneider's business—does not provide a basis for finding that Brant was an employee. This factor likely weighs in Brant's favor. Schneider is in the business of providing over-the-road transportation of freight. And Brant provided transportation of freight.

While this factor may support Brant, this Court has recognized that "no criterion is by itself, or by its absence, dispositive or controlling" when deciding whether a worker was an

independent contractor or an employee.  *Lauritzen*, 835 F.2d at 1534.  Instead, a court should look "to all the circumstances of the work activity."  *Id.*  And as explained above, the circumstances here show that Brant was an independent contractor.

### B.     The district court's reliance on the Operating Agreement does not undermine its decision to dismiss.

Brant urges this Court to reverse because the district court relied on the language of the Operating Agreement to conclude that he was an independent contractor.  He argues that since "'[e]conomic reality' rather than contractual form is indeed dispositive," the district court's reliance on the Operating Agreement was error.  Appellants' Opening Br. at 31 (quoting *Lauritzen*, 835 F.2d at 1544–45 (Easterbrook, J., concurring)).

On the contrary, the district court did not err when it dismissed Brant's claims based on the allegations of his complaint and the language of the Operating Agreement.  "[T]he determination of workers' status is a legal rather than a factual one."  *Lauritzen*, 835 F.2d at 1535.  Thus, it can be resolved at the motion to dismiss stage.  *See Berger*, 843 F.3d at 290 (affirming dismissal of allegations that student-athletes were employees for purposes of the FLSA).  In resolving a motion to dismiss, a court may also consider documents that are "referred to in the plaintiff's complaint and are central to his claim," like the Operating Agreement and Lease.  *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).  Thus, the district court properly looked to the terms of the Operating Agreement, Lease, and allegations in the First Amended Complaint to conclude that Brant was an independent contractor.

Brant suggests that the district court's decision to rely on the terms of the Operating Agreement conflicts with the "economic realities" test that this Court has used.  But that argument ignores that the terms of the Operating Agreement and Lease were essential to defining the

economic reality of the relationship between Brant and Schneider. These documents established both the rights and obligations that Brant had under his arrangement with Schneider. Thus, the district court properly relied on them when assessing the economic realities underlying Brant's claims.

Of course, some courts have stated that "it is not what the operators *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive" of independent contractor status. *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987). And Brant urged the district court to disregard a number of options available to him under the Operating Agreement and Lease because financial and logistical considerations discouraged him from pursuing those rights.

But as the district court explained, the terms of the Operating Agreement are relevant even if Brant chose not to exercise rights under that Agreement. The fact that Brant found the exercise of some of those rights "difficult" merely reflects that he was subject to the same economic considerations that many businesses face. A8. Moreover, "an independent contractor who is dissatisfied with the terms of his agreement may not transform his independent contractor status into statutory employee status merely by choosing not [to] exercise the rights that he has been given." A8. Brant entered an agreement that "gave him considerable control over his business," and he chose how to exercise that control. *Id.* For this reason, it is unsurprising that courts have looked to the terms of a contract to decide whether a worker is an independent contractor under the FLSA. *See Herman*, 161 F.3d at 305 (noting that "the 'Independent Contractor Agreement' does not contain a covenant-not-to-compete").

Brant points to only one example where the district court relied on a right he had under the Operating Agreement, and he alleges that he could not exercise that right. The district court noted that Brant had the right to work for other carriers with Schneider's permission. But Brant points to a conclusory allegation that Schneider told him that it would never grant him permission.

As an initial matter, Brant's conclusory allegation that Schneider would have denied permission is not enough to show that he had no ability to work for another carrier. Brant does not allege that he ever sought work for another carrier or actually asked Schneider for permission. Nor does he even explain who from Schneider allegedly told him that permission would be denied.

More importantly, Brant would still be an independent contractor even if, arguendo, he lacked the ability to use the truck he had leased to Schneider to transport freight for other carriers. The district court cited to numerous factors including his control over his own schedule and manner of transporting freight, his substantial investment, and the temporary nature of his relationship with Schneider that supported the conclusion that he was an independent contractor. And the district court placed particular emphasis on his ability to hire his own employees to perform work for Schneider—a responsibility inconsistent with employee status. While Brant alleges that practical considerations like schedule and finances may have constrained his decisions, no allegation in the complaint establishes that he did not have the ability to make these decisions provided for in the Operating Agreement.

## II.  Brant cannot bring a claim for unjust enrichment because he agreed to a valid contract that governed his relationship with Schneider.

Brant's claim of unjust enrichment fails because he entered a contract that governed his relationship with Schneider. A claim of unjust enrichment has "three elements: (1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such

benefit, and (3) acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof." *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 477 (7th Cir. 2009) (quotation marks and citation omitted).  But this equitable doctrine "does not apply where the parties have entered into a contract."  *Cont'l Casualty*, 473 N.W.2d 584, 587 (Wis. App. 1991).  Brant's unjust enrichment claim rests on deductions from his OO payments that were governed by the Operating Agreement and Lease.  *See* SA38 ¶ 182.  Thus, they fail as a matter of law.

Brant does not dispute that unjust enrichment does not apply when a contract governs the relationship between parties or that his unjust enrichment claim seeks to recover for costs governed by the Operating Agreement and Lease.  *See* Appellants' Opening Br. at 32–40.  Instead, he argues that the contract governing his relationship with Schneider was void or voidable because it was unconscionable.  *See id.*

As the district court found, Brant's argument that the Operating Agreement and Lease were substantively unconscionable rests on the incorrect assertion that Schneider had misclassified him as an employee.  He claimed, for example, that Schneider had shifted "operating expenses and risk of operation" to him "something that [Schneider] could not legally do with employees."  SA31 ¶ 154(a).  He also alleged that the Operating Agreement required him to "indemnify" Schneider for various potential costs "as a result of [the] unlawful misclassification scheme."  SA33 ¶ 154(g).  And he argued that the Operating Agreement permitted Schneider to rescind if the "misclassification scheme is determined to be unlawful and Drivers are found to be employees."  SA33 ¶ 154(h).

Brant points out that several of his allegations did not mention his classification as an independent contractor and one of them alleged that certain provisions were unconscionable "regardless of [Schneider's] misclassification of Drivers."  SA31–32 & ¶ 154(b).  But these allegations still point to typical burdens of an independent contractor relationship.  For example, Brant alleged that the Operating Agreement permitted Schneider to deduct Schneider's "business expenses" from his OO payments even when that meant that he made less than the minimum wage.  Appellants' Opening Br. at 35.  But an independent contractor is "in business for himself." *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332 (5th Cir. 1993).  So Brant's reliance on Schneider seeking repayment for the cost of transporting freight likewise rests on the premise that he was not an independent contractor.

Most of Brant's other allegations of substantive unconscionability are merely risks that he accepted under the Operating Agreement and Lease.  *See* SA32 ¶ 154(c) (alleging that Brant had fixed financial obligation but Schneider was not obligated to give him any amount of work); SA32 ¶ 154(d) (alleging that Schneider could terminate the Operating Agreement at will and Brant would still have obligations under the Lease); SA32 ¶ 154(e) (alleging that the risk of financial penalties caused Brant to continue work for Schneider).  But the "risk of loss" is an ordinary feature of an independent contractor arrangement.  *Lauritzen*, 835 F.2d at 1536.  Thus, these allegations also point only to features of an independent contractor arrangement.

Since almost all of his allegations of substantive unconscionability merely allege that Schneider treated him as an independent contractor rather than an employee, Brant has failed to allege a plausible claim of substantive unconscionability.  This failure alone is enough to defeat his allegation that the Operating Agreement and Lease were void or voidable because they were

34

unconscionable. "For a contract or a contract provision to be declared invalid as unconscionable, the contract or contract provision must be determined to be both procedurally and substantively unconscionable." *Wisconsin Auto Title Loans, Inc. v. Jones*, 714 N.W.2d 155, 164 (Wis. 2006).

But even putting aside Brant's failure to plead substantive unconscionability, his allegations of procedural unconscionability similarly fail. He alleges that the Operating Agreement and Lease were unconscionable because they were form contracts presented to relatively uneducated owner-operators with no opportunity to negotiate and inadequate time to review. SA30–31 ¶ 153. This argument, however, is refuted by his own allegations. He alleged that each Operating Agreement lasted for only a short term. SA24 ¶ 107. Before each of these Operating Agreements would end, Schneider would send a new Operating Agreement for the owner-operator to review. SA24 ¶ 108. In other words, Schneider provided Operating Agreements to owner-operators when they had adequate time to review and consult with an attorney if they chose.

## III.   Brant has failed to allege any violation of the Truth-in-Leasing regulations.

The Motor Carrier Act grants the Department of Transportation authority to "issue regulations . . . with respect to the transportation of household goods by motor carriers." 49 U.S.C. § 14104(a). The Department has exercised this authority to enact regulations of leases on equipment for use in transporting freight. *See* 49 C.F.R. § 376.1; *see also Mervyn v. Atlas Van Lines, Inc.*, 882 F.3d 680, 682 (7th Cir. 2018). These Truth-in-Leasing regulations establish "conditions" for a person authorized to transport property as a motor carrier to transport property in equipment he does not own. 49 C.F.R. § 376.11(a). Those conditions include a "written lease granting the use of the equipment and meeting the requirements contained in [49 C.F.R.] § 376.12." *Id.*

### A. Brant has failed to allege damages from any violation of the Truth-in-Leasing regulations.

Brant's claims for violations of the Truth-in-Leasing regulations required him to plead that he suffered damages because of those violations. *See* 49 U.S.C. § 14704(a). Section 14704(a)(2) provides that "[a] carrier or broker providing transportation or service . . . is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part." 49 U.S.C. § 14704(a)(2). This provision does not permit suits for "abstract violations." *Fulfillment Servs.*, 528 F.3d 614, 621 (9th Cir. 2008). Instead, a plaintiff can bring only suits for "for damages sustained by a person as a result of" a violation. 49 U.S.C. § 14704(a)(2). The plaintiff's suit is limited to "the extent of the injury actually suffered." *Fulfillment Servs.*, 528 F.3d at 621. Thus, "to state a claim, a plaintiff must . . . allege damages as a consequence of the violation." *Id.*

Brant has failed to allege that any TILA violations caused him damages. He has alleged that Schneider violated three different provisions of the Truth-in-Leasing regulations. But he has failed to point to any specific harm that he suffered as a result of an alleged violation.

To begin, Brant argues that Schneider failed to comply with a requirement to provide him with a weighted freight bill or other document containing the same information by the time of settlement. Appellants' Opening Brief at 40–42; *see also* SA33 ¶ 155 ("[T]he Operating Agreement failed to specify that Defendants would provide [this information] at or before the time of settlement."). He does not argue that he could not access the relevant information. Instead, his argument focuses on the failure to provide this information by the time of settlement. *Id.*

To plead damages under his theory, Brant would have to allege that he suffered injury because he did not receive a freight bill or similar statement by the time of settlement. But he fails

to make any allegation that he was harmed by a delay in receiving information from the freight bill. He does not point to any freight bill or equivalent information showing an underpayment, let alone assert that he was unable to have the underpayment corrected because he did not receive the relevant documents before or at settlement. *See* SA33–34 ¶¶ 155–57.

Moreover, this Court's precedent establishes that Brant's ability to examine documents supporting his revenue stream means that any failure to challenge an underpayment was not the result of a failure to provide a timely copy of a freight bill. *Stampley v. Altom Transport, Inc.*, 958 F.3d 580 (7th Cir. 2020), involved an agreement that provided the owner-operator had 30 days to contest his payment after he received the freight bill or computer-generated document containing the same information required by the Truth-in-Leasing regulations. *Id.* at 587–88. This Court held that this 30-day limit applied even when the computer-generated document provided to the owner-operator did not include all the information from the freight bill. The Court explained that "an insufficient computer-generated document neither prevented [the owner-operator] from exercising his right . . . to examine the underlying documents, nor from challenging his payments." *Id.* at 588. The owner-operator's failure to timely challenge his payments resulted from his choice "simply to trust the documents he received, and not to verify them, or to challenge" his payments. *Id.*

*Stampley*'s reasoning confirms that any alleged failure to provide freight bills or documents containing the same information did not cause Brant's inability to challenge any underpayments. As in *Stampley*, the Operating Agreement gave Brant the right to review documents that supported his payments. *See* ECF No. 71-2 at 8 ¶ 4(e); ECF No. 71-3 at 8–9 ¶ 4(e). Brant would have been aware he had not received the freight bill or other document to support his payments. But

as the district court noted, he never alleges that he sought documents from Schneider, and that Schneider denied any such request for documents. A15. Thus, Brant's inability to challenge alleged underpayments due to a lack of information reflects his choice not to seek the relevant information, not Schneider's failure to provide the information.

Brant's claim that Schneider failed to adequately disclose deductions fails for similar reasons. To show damages on this claim, Brant would need to point to an improper charge-back that he could have successfully challenged if he had been supplied with the allegedly withheld information. But he has failed to identify any improper charge-back. Nor has he explained why Schneider's failure to provide him with information prevented him from challenging any charge-backs. Instead, he merely speculates that Schneider imposed improper charge-backs that he might have challenged with more information.

And as with Brant's freight bill claim, Brant's failure to challenge allegedly improper charge-backs is the result of his decision not to seek information instead of Schneider's failure to provide documents. The Operating Agreement provides that he had the right to review documents that would have shown if Schneider had applied improper charge-backs, and he would have been aware that he did not receive information about charge-backs. *See* ECF No. 71-2 at 8 ¶ 4(e); ECF No. 71-3 at 8–9 ¶ 4(e). But he does not allege that he sought the documents that would permit him to assess the charge-backs. A15. Any failure to challenge improper charge-backs thus flows from his decision not to seek information about those charge-backs. *Stampley*, 958 F.3d at 588.

Finally, Brant does not argue that he has shown any damages from the alleged failure to disclose all required deposits.  Thus, he has failed to identify any alleged violation that resulted in damages.

## B.     Brant has failed to allege any violation of the Truth-in-Leasing regulations.

Brant alleged three violations of the Truth-in-Leasing regulations.  He first alleged that Schneider failed to provide him with a copy of the rated freight bill or other similar document when his revenue stream was based on revenue for a shipment.  SA33–34 ¶¶ 155–56.  He next alleged that Schneider had failed to provide him with information showing the basis for charge-backs deducted from his revenue stream.  SA34–35 ¶¶ 158–60.  Finally, Brant argues that Schneider failed to disclose all escrow payments that he might be required to make.  SA35 ¶ 61. But the terms of the Operating Agreement and the allegations of Brant's First Amended Complaint show that Brant failed to plausibly allege any violation of these provisions.

### 1.     The Operating Agreement gave Brant the right to information from the freight bill at the time of settlement.

Brant first argues that he adequately alleged that Schneider violated a requirement that the lease must provide that the carrier will give the lessor a copy of the weighted freight bill or another form containing the same information.  The Truth-in-Leasing regulations provide that "[w]hen a lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the authorized carrier will give the lessor, before or at the time of settlement, a copy of the rated freight bill, or, in the case of contract carriers, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill."  49 C.F.R. § 376.12(g).  In the First Amended Complaint, Brant admitted that the Operating

Agreement "states that Defendants shall provide Drivers a copy of the rated freight bill, or a computer-generated summary thereof, for those shipments where Plaintiff and other Drivers are paid based on a percentage of the revenue Defendants receive." SA33. But he alleged that it "failed to specify that Defendants would provide it at or before the time of settlement." *Id.* He also alleged that "[e]ven though Defendants paid Plaintiff based on a percentage of the revenue" Schneider "did not provide Plaintiff or other Drivers with the rated freight bill, or other documentation actually used for a shipment containing the same information that would appear on a rated freight bill." *Id.*

Brant's allegations about the terms of the lease cannot be squared with the language of the lease. Several provisions of the Operating Agreement state that Schneider would provide the information called for by § 376.12(g). To begin, the Operating Agreement specifies that Schneider "shall provide a copy of the rated freight bill (or a computer-generated summary) to [Brant] for those Shipments on which [Brant]'s linehaul payment is based on a percentage of revenue." ECF No. 71-2 at 8; ECF No. 71-3 at 8. It further provides that Brant "shall have the right to examine copies of [Schneider]'s tariffs at [Schneider]'s home office during reasonable business hours." *Id.* And it provides that any payments would be "supported by a statement providing, in reasonable detail, the calculations used in determining the . . . Payments owed to [Brant] and any deductions." *Id.* at 7–8. In other words, the payment would be supported by a statement including "the same information that would appear on a rated freight bill" and more. 49 C.F.R. § 376.12(g). These provisions provide Brant with access to the information covered by the Truth-in-Leasing regulations. *See id.*

Brant does not argue that the Operating Agreement failed to specify that Schneider would provide him with a freight bill or similar statement when required by the Truth-in-Leasing regulations. Appellants' Opening Br. at 41–42. Instead, he continues to argue that the Operating Agreement fails to "say that the information will be provided before or at the time of settlement." *Id.* at 41.

This argument, however, ignores provisions establishing that Brant would receive the necessary information when transactions were settled. The Operating Agreement provides that Brant would be "compensated . . . in accordance with the usual settlement practices of [Schneider] within fifteen (15) days after" he submitted necessary paperwork. ECF No. 71-2 at 7. This payment at the time of settlement would be "supported by a statement providing, in reasonable detail, the calculations used in determining the . . . Payments owed to [Brant] and any deductions." *Id.* at 7–8.

### 2. Schneider's disclosure of charge-backs complied with the Truth-in-Leasing regulations.

Brant next argues that the Operating Agreement failed to comply with the requirement that a Lease must disclose charge-backs. The Truth-in-Leasing regulations provide that a lease "shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed." 49 C.F.R. § 376.12(h). It also provides that a "lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge." *Id.*

The Operating Agreement and Lease complied with these provisions. The Operating Agreement included a table that specified any items that would be charged against Brant's OO

Payments and either provided the amount or explained how the deduction would be calculated. ECF No. 71-2 at 64–68; ECF No. 71-3 at 64–68. And as explained, the Agreement provided that payments would be "supported by a statement providing, in reasonable detail, the calculations used in determining the . . . Payments owed to [Brant] and any deductions." *Id.* at 7–8. It also granted Brant the right to review documents at Schneider's headquarters. *Id.*

Brant concedes that the Operating Agreement includes "a list of charge-backs." Appellants' Opening Br. at 42. He argues, however, that the Agreement only listed a method of computation that would require additional documents to determine the validity of a charge and Schneider did not provide him with those documents. *See id.* at 42–43. Although his First Amended Complaint failed to cite any specific examples of this alleged failure, he now cites the Agreement's explanation that the charge-back for "Medical Examination" will be the "actual cost of medical examination." *Id.* at 42 (quoting ECF No. 71–3 at 64).

The Operating Agreement's specification of the "actual cost" of variable rate items complies with the Truth-in-Leasing regulations. Because the Truth-in-Leasing regulations require only a specification of deductions and explanation of how those deductions will be computed, courts have recognized that disclosure of the components of a charge-back that will vary depending on costs will be sufficient. For example, the Ninth Circuit has explained that a charge-back composed of the actual costs of a service plus an administrative fee would require a statement listing those two components. *See Owner–Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co.*, 632 F.3d 1111, 1119–20 (9th Cir. 2011).

The specification of charges in the Operating Agreement complied with this requirement. It listed the actual amount of fixed-rate charge-backs. ECF No. 71-2 at 64–68; ECF No. 71-3 at

64–68.  And it listed the components of variable-rate charges like the "actual cost of medical examination." *Id.*

Moreover, Brant has failed to adequately allege a failure to disclose the information needed to "determine the validity" of a deduction.  49 C.F.R. § 376.12(h).  He alleged generally that Schneider had failed to provide him "with the documents necessary to determine the validity of charge-back items deducted from Drivers' pay."  SA34 ¶ 158.  The First Amended Complaint does not identify any deductions that were allegedly withheld without providing the supporting information.  For example, he now cites to the charge-back for the actual costs of a medical examination.  But his complaint never mentioned any charge-back for a medical examination or even whether he had a medical examination.  Thus, he has failed to allege that Schneider deducted this charge-back—or any other—from his pay without providing adequate documents.

Brant relies on his allegation that Schneider deducted "approximately $1,200 from [his] bank account without providing any information regarding the reason for the charge or documentation for [him] to determine the validity of the charge."  SA34 ¶ 160; *see also* Appellants' Opening Br. at 42.  But that allegation fails to allege a violation of the Truth-in-Leasing regulations for several reasons.  For one, Brant alleges only that Schneider withdrew $1,200 from his bank account.  He fails to allege either that this withdrawal was for a cost initially paid by Schneider and then deducted from his OO Payments or to present any facts to support an inference that this was an OO Payment pay deduction.  In fact, his own allegations suggest that this charge may not have been a charge-back deducted from his OO Payments.  He alleges that he called both Schneider Finance and Schneider National, but both entities told him that they had not withdrawn the funds.  SA34 ¶ 160.  Section 376.12(h), however, reaches only "items that may be initially paid

for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement." 49 C.F.R. § 376.12(h).

For another, as the district court noted, Brant fails to allege that he sought access to documents and Schneider refused his request. A15. He alleges, at most, that he contacted both Schneider National and Schneider Finance when he believed that Schneider had levied a charge against his account. But after both entities explained that they had not charged his account, he includes no allegation that he pursued the matter further. SA34 ¶ 160.

### 3. The Operating Agreement and Lease disclosed all required escrow funds.

Finally, Brant alleges that Schneider failed to comply with the provisions of the Truth-in-Leasing regulations that govern escrow funds. Those provisions require that "[i]f escrow funds are required, the lease shall specify . . . [t]he amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party." 49 C.F.R. § 376.12(k)(1).

The Lease complied with this provision. As the district court explained, Appendix A to the Lease stated the amount of the security deposits required from Brant. *See* A15. It provided that Brant would pay no initial security deposit. ECF No. 71-4 at 11. He would be required to pay a deferred security deposit of $1,000 in periodic payments of $100. *Id.*

Brant argues that the Lease failed to comply with this provision because the Lease does not include the amount of the "additional security deposit" that Schneider could seek after Brant failed to enter a new operating agreement with a carrier approved by Schneider. But this argument rests on a misreading of the Lease.

The Truth-in-Leasing regulations apply only to funds "required to be paid by the lessor." 49 C.F.R. § 376.12(k)(1). Section 19(L) of the Lease did not require Brant to pay any funds.

Section 19 recognizes a number of "events or conditions" that "will constitute an Event of Default." ECF No. 71-4 at 7. One of these conditions is the termination of an operating agreement and Brant's failure to enter a new operating agreement "with another Operating Carrier approved by [Schneider]" in five days. *Id.* at 8. But Section 19(L) also limits Schneider's "discretion" to reject an operating agreement with another carrier. *Id.* Schneider can assess only "credit risk issues presented" by the new operating agreement "including, but not limited to, [Brant]'s agreement to increase the Security Deposit Account by such amounts as [Schneider] deems necessary to protect its interests hereunder (which in most instances is not expected to exceed an additional $5,000)." *Id.* In other words, the "additional security deposit" Brant relies on is a limit on Schneider's discretion to reject an agreement between Brant and another carrier. *See id.* Even then, the Lease did not "require" the payment. It provided only that Schneider could consider whether Brant would agree to the additional payment. *Id.*

## **CONCLUSION**

For the foregoing reasons, the decision of the district court should be affirmed.

## **REQUEST FOR ORAL ARGUMENT**

Because this appeal presents important questions on the application of the FLSA, Wisconsin's minimum wage laws, unjust enrichment under Wisconsin law, and the Truth-in-Leasing regulations, Appellees respectfully request that this Court grant oral argument.

Dated: November 18, 2021             */s/ Gilbert C. Dickey*

Gilbert C. Dickey
McGuireWoods LLP
201 North Tryon Street

Suite 3000
Charlotte, NC 28202
T: (704) 343-2396
F: (704) 444-8854
gdickey@mcguirewoods.com

Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716
F: (804) 698-2251
mfitzgerald@mcguirewoods.com

Joel H. Spitz
Michael R. Phillips
MCGUIREWOODS LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601
T: (312) 750-5704
F: (312) 920-6121
jspitz@mcguirewoods.com
mphillips@mcguirewoods.com

*Counsel for Defendants–Appellees*
*Schneider National, Inc., et al.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Circuit Rule 32(c) because the brief contains 13,569 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5), Federal Rule of Appellate Procedure 32(a)(6), and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft 2016, in 12-point size Adobe Caslon Pro font. The undersigned has relied on the word count feature of this word processing system in preparing this certificate.

*/s/ Gilbert C. Dickey*

## CIRCUIT RULE 30(d) STATEMENT

Under Circuit Rule 30(d), I hereby certify that all material required by Circuit Rule 30(a) and (b) is included in the Separate Appendix and Appendix.

*/s/ Gilbert C. Dickey*

47

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2021, the foregoing was filed with the Clerk of the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system, which will also serve counsel of record.

<div align="center" style="margin-left:40%">

*/s/ Gilbert C. Dickey*
Gilbert C. Dickey

*Counsel for Defendants–Appellees*
*Schneider National, Inc., et al.*

</div>