In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-2122

ERIC R. BRANT,

*Plaintiff-Appellant,*

*v.*

SCHNEIDER NATIONAL, INC., et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 20-cv-01049-WCG — **William C. Griesbach**, *Judge.*

———————————

ARGUED JANUARY 21, 2022 — DECIDED AUGUST 3, 2022

———————————

Before HAMILTON and KIRSCH, *Circuit Judges.*[*]

HAMILTON, *Circuit Judge.* Plaintiff-appellant Eric Brant appeals the district court's dismissal of his claims against Schneider National, Inc. and its two subsidiaries (together,

---

[*] Circuit Judge Kanne was a member of the panel that heard argument in this case but died on June 16, 2022. He did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

"Schneider"). Schneider is engaged in the business of hauling freight and hires some drivers as employees, while bringing others on as purported independent contractors. Brant hauled freight for Schneider under an agreement that labeled him as an independent contractor in 2018 and 2019. Brant came to believe, however, that Schneider was engaged in a scheme to misclassify his employment status, and he filed this suit.

Brant claims that Schneider (i) violated minimum wage requirements under the federal Fair Labor Standards Act and Wisconsin law; (ii) unjustly enriched itself under Wisconsin law; and (iii) violated federal Truth-in-Leasing regulations. The district court granted Schneider's motion to dismiss all claims on the pleadings. Brant appeals.

We reverse and remand for further proceedings. The district court erred by giving decisive effect to the terms of Schneider's contracts. In many areas of the law, the district court's approach would be sound, but not under the Fair Labor Standards Act. As explained below, in determining whether a person is an employee under the Act, what matters is the economic reality of the working relationship, not necessarily the terms of a written contract. "The FLSA is designed to defeat rather than implement contractual arrangements." *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1544–45 (7th Cir. 1987) (Easterbrook, J., concurring). Brant's allegations about the economic reality of his working relationship with Schneider state a viable claim under the FLSA, as well as under the other laws he relies upon.

I.  *Factual and Procedural Background*

Schneider is a major motor carrier and in 2019 oversaw thousands of trucks in its freight business. Schneider hires

most of its drivers as employees, but in 2020 it designated more than a quarter of its drivers as independent contractors. In the industry, such contractors are referred to as "owner-operators." They frequently own their own trucks and drive for carriers as they choose. Owning a truck for hauling freight requires a significant capital investment, and Schneider sought to recruit drivers who had not independently made that investment by leasing Schneider's trucks to some drivers who would then drive for Schneider under contract. Brant became an "owner-operator" under such an arrangement with Schneider, and he worked for the carrier from December 2018 to August 2019.

Brant's relationship with Schneider involved two related contracts: (i) the Lease, under which he leased a relatively new Freightliner truck from Schneider; and (ii) the Operating Agreement, under which Brant would lease the truck back to Schneider and receive 65% of the gross revenue for shipments he hauled for Schneider. The Operating Agreement purported to give Brant substantial control over his work. It also included provisions permitting him to haul loads for other carriers and to hire other drivers to assist if he desired. He was also responsible for all operating expenses under this contract. Schneider retained sole discretion, however, to deny him permission to haul loads for other carriers. The Lease also depended in part on the continuation of the Operating Agreement. Termination of the Operating Agreement would trigger a default on the Lease if Brant could not secure Schneider's permission to enter a new agreement with Schneider or another carrier. Defaulting on the Lease would be serious. Schneider reserved the right on default to take measures such as declaring as due the remaining sums for the entire two-year term of the Lease.

Brant and Schneider provide starkly different accounts of Brant's actual work. Brant alleges that he struggled to haul enough profitable shipments to keep ahead of his operating costs and charges from Schneider. In his account, Brant was not able to exercise his independent expertise to increase his margins. He simply had to say yes to as many loads from Schneider as he could, even when they were highly undesirable. For example, Brant claims that during the week of May 2, 2019, he drove over 3,000 miles hauling five shipments for Schneider, and because of the expenses that Schneider deducted from his pay he received zero net pay. In Brant's view, the Operating Agreement and Lease were designed to misclassify him as an independent contractor, while Schneider controlled him in the manner of an employee without respecting his rights under federal and state employment laws.

Brant claims that at one point he sought to terminate the Operating Agreement and haul freight in his leased truck for another carrier. He alleges that Schneider demanded such a large security deposit to allow him to haul for another carrier that he was unable to afford it. Schneider eventually seized Brant's truck when he later terminated the Operating Agreement and could not pay the additional security deposit.

Schneider sees things differently, relying on the terms of the written contracts. Schneider explains that it extended credit to Brant that allowed him to lease a truck and operate his own independent business. In Schneider's view, Brant freely engaged to haul freight for the carrier and was free to accept or reject the shipments he was offered while retaining total operational control of his business. To Schneider, the Operating Agreement and Lease show that Brant was an independent contractor whom Schneider enabled to manage his

own operations, to hire additional drivers, or to haul loads for other carriers.

Brant sued Schneider in July 2020, claiming violations of federal and state law. First, Brant alleged that Schneider failed to pay him the federal minimum wage that he was due as an employee under the FLSA. Second, he alleged that Schneider also failed to pay him the minimum wage required for an employee under Wisconsin law. Third, Brant alleged that his contracts with Schneider were void as unconscionable, and that Schneider unjustly enriched itself by retaining certain money deducted from his pay in violation of Wisconsin law. Fourth, Brant alleged that Schneider violated certain Truth-in-Leasing regulations requiring the disclosure of information to owner-operators, giving him a cause of action under 49 U.S.C. § 14704(a)(2).

Before resolving whether Brant could proceed on his FLSA claim as a collective action under 29 U.S.C. § 216(b), the district court granted Schneider's motion to dismiss on the pleadings. *Brant v. Schneider Nat'l, Inc.*, 2021 WL 179597 (E.D. Wis. Jan. 19, 2021). The court gave Brant leave to amend and instructions on deficiencies he needed to cure if he could. Brant filed an amended complaint, but the district court found that he had not cured the problems with his complaint and entered judgment against him, dismissing the case with prejudice.

II. *Analysis*

We review de novo a district court's dismissal for failure to state a claim under Rule 12(b)(6). *Sloan v. American Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018). In evaluating the complaint's sufficiency, we accept as true all well-pled

facts and make any reasonable inferences in the non-movant's favor. *Id.* at 893. Dismissal under Rule 12(b)(6) is appropriate if the complaint fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff needs to provide "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010), quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008). If the complaint is plausible, the plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Chapman v. Yellow Cab Cooperative*, 875 F.3d 846, 848 (7th Cir. 2017), quoting *Twombly*, 550 U.S. at 563. We address Brant's claims in turn.

A.  *FLSA Claim*

The Fair Labor Standards Act provides: "Every employer shall pay to each of his employees who in any workweek is engaged in commerce" the federal minimum wage, which is now $7.25 per hour. See 29 U.S.C. § 206(a). Employers who violate § 206(a) are liable to their employees for unpaid wages and may also be liable for liquidated damages. See §§ 216(b) & 260. There is no question that Brant engaged in commercial activities covered by the Act. Thus, to state a claim for violation of the FLSA's minimum wage provisions, he must allege facts giving rise to a plausible inference that he was an employee within the meaning of the Act and that he was underpaid for at least one workweek. *Hirst v. SkyWest, Inc.*, 910 F.3d 961, 966 (7th Cir. 2018).

Brant satisfies the latter point easily. For example, he alleges that during the week of May 2, 2019 he drove over 3,000 miles to deliver five shipments, but received no net pay for the week. Because Brant's complaint allows a plausible inference that he was underpaid during at least one workweek, he has stated a claim for minimum wage under the FLSA if we can plausibly infer from his complaint that he was an employee covered by the Act.

Under the FLSA, and with certain exceptions not at issue here, the definitions of key relevant terms are both broad and circular:

> (d) "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee….
>
> (e)(1) … the term "employee" means any individual employed by an employer.
>
> …
>
> (g) "Employ" includes to suffer or permit to work.

29 U.S.C. § 203.

The Supreme Court noted in 1947 that these definitions in the FLSA are broad and do not clarify how to address "problems as to the limits of the employer-employee relationship under the Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947); see also *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945) ("A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame."). The common law also provides only limited guidance in marking the outer reaches of the FLSA's coverage. The

Act was designed to reach working relationships that would not have qualified as employer-employee under the common law. *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150–51 (1947). Congress designed the FLSA to reshape the economy to avoid the economic and social ills caused by low pay and long hours for workers, and the Act requires a different interpretation of its broader terms. See Fair Labor Standards Act of 1938, Pub. L. No. 75-718, § 2(a), 52 Stat. 1060, 1060; *Rutherford Food*, 331 U.S. at 727.

If we looked only at the face of Brant's contracts with Schneider, we would agree with the district court that Brant could not be deemed an employee. It is well established, however, that the terms of a contract do not control the employer-employee issue under the Act. We look instead to the "economic reality of the working relationship" to determine who is an employee covered by the FLSA. *Simpkins v. DuPage Housing Authority*, 893 F.3d 962, 964 (7th Cir. 2018); see also *Rutherford Food*, 331 U.S. at 729 (use of "independent contractor" label does not remove FLSA protections when work "follows the usual path of an employee"); *Lauritzen*, 835 F.2d at 1544–45 (Easterbrook, J., concurring) ("The FLSA is designed to defeat rather than implement contractual arrangements. If employees voluntarily contract to accept $2.00 per hour, the agreement is ineffectual."). Workers are employees under the FLSA when "as a matter of economic reality [they] are dependent upon the business to which they render service." *Simpkins*, 893 F.3d at 964, quoting *Lauritzen*, 835 F.2d at 1534.

This court generally applies the six-factor test set out in *Lauritzen* to determine whether economic reality indicates a worker is an employee. *Simpkins*, 893 F.3d at 964; *Lauritzen*, 835 F.2d at 1534–35. The *Lauritzen* factors are:

1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

4) whether the service rendered requires a special skill;

5) the degree of permanency and duration of the working relationship;

6) the extent to which the service rendered is an integral part of the alleged employer's business.

835 F.2d at 1535.[1]

No single factor is necessarily controlling—the ultimate conclusion on employee status is made by examining the totality of the circumstances. *Simpkins*, 893 F.3d at 964. We consider throughout our review of these factors the degree to which Brant was dependent on Schneider, with greater

---

[1] Other circuits apply similar multi-factor tests to plot the boundaries of employer-employee relationships under the FLSA. See, e.g., *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1235 (10th Cir. 2018); *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016); *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 536–37 (2d Cir. 2016).

dependence weighing in favor of an employer-employee relationship. *Lauritzen*, 835 F.2d at 1538.

### 1. *Control*

First, we consider the nature and degree of Schneider's control over the way that Brant performed his work. This control inquiry has roots far deeper than the other *Lauritzen* factors and originates in the common-law test to find the master-servant relationship giving rise to respondeat superior liability. See Oliver Wendell Holmes, Jr., *Agency*, 5 Harv. L. Rev. 1, 14–15 (1891) (noting that extent of employer's control is logical limit for liability for actions of servant); Seymour D. Thompson, *Respondeat Superior*, 5 S. L. Rev. (New Series) 238, 251–52 (1879) (defining limit of master/employer relationship by right to control actions of servant/employee). One way to understand this factor is to ask whether the worker has control over such a meaningful portion of his labor that he operates as a separate economic entity, i.e., as an independent contractor. See *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 381 (5th Cir. 2019).

The Operating Agreement provided that the "Owner-Operator shall determine the manner, means and methods of performance of all Freight Transportation Services." The Agreement included a variety of provisions purporting to grant the driver broad authority over his or her own work. It said Brant was free to choose which shipments to accept or reject, and even whether to take any loads at all. The Agreement permitted him to hire drivers to take some or all responsibility for a shipment. Brant was also required to bring his own truck, to select routes, to manage his schedule, to weigh and inspect shipments, and to pay for operating costs like fuel and taxes. Schneider argues that these terms in the Agreement

show that Brant maintained a high degree of control over his work, consistent with his classification as an independent contractor.

But according to Brant's allegations, these contractual provisions did not reflect the economic reality of his work under Schneider and are not dispositive. See *Simpkins*, 893 F.3d at 964; *Lauritzen*, 835 F.2d at 1545 (Easterbrook, J., concurring). Brant alleges that Schneider "exercised complete control over all meaningful aspects of the transportation business in which Plaintiff … worked." As we will see, Brant alleges he was subject to significant monitoring and had little ability to exercise the limited rights for operational control of his work granted on the face of his contracts with Schneider. This alleged lack of genuine control over the conduct of his work weighs in favor of finding Brant was an employee.

*Control Over Conduct*: As a freight carrier, Schneider controlled advertising, billing, and negotiation with customers over the terms of shipment contracts. Brant alleges that Schneider's control also extended into the minutiae of how he worked and delivered his loads. Brant alleges he was held to the same operational standards and policies as employee-drivers for Schneider, including requirements for "personal appearance and demeanor," "how to pick up and deliver loads," and "how to hire extra help to assist with loading and unloading." Allegations that a purported employer required workers to adhere to such formal policies and procedures can suggest employee status. See *Schultz v. Capital Int'l Security, Inc.*, 466 F.3d 298, 307 (4th Cir. 2006) (reversing defense verdict after bench trial; undisputed facts, including requirement that workers adhere to detailed standard operating

procedures, showed employee status even when workers occasionally exercised independent judgment).

*Monitoring*: Schneider also retained the right to gather remotely and to monitor huge quantities of data about how drivers conducted their work, including: (i) "Owner-Operator's speed, hard braking incidents, collisions, and critical driving events;" (ii) "hours of service;" (iii) "engine operational data;" and (iv) "any other telematics data which may be captured." The Agreement required Brant to consent to allow Schneider to use this data "for any reason [Schneider] deems advisable," and Schneider had the right to terminate the Agreement immediately for any traffic law violation identified. Brant alleges that Schneider did not permit him to drive over 70 miles per hour even when the posted speed limit was higher and that he was subject to discipline if he failed to comply. This allegedly high degree of scrutiny into the fine details of the driver's operations, along with the constant threat of termination for non-compliance, weighs in favor of status as an employee rather than an independent contractor.

*Hiring Helpers*: Schneider also argues that "Brant's ability to hire his own employees to transport freight weighs heavily in favor of the conclusion that he exercised control over the manner of performing his work consistent with an independent contractor." Under the contracts, Brant could, at least in theory, hire another driver to assist with or to take over his shipments entirely. When a worker hires helpers to assist in a job, that fact weighs against employee status. See *United States v. Silk*, 331 U.S. 704, 719 (1947) (suggesting fact that truckers "hire their own helpers" supports independent contractor status under Social Security Act), abrogation in part recognized by *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 325 (1992)

(noting abandonment of *Silk*'s emphasis on construing term "employee" in the Social Security Act "in the light of the mischief to be corrected and the end to be attained"); see also *Rutherford Food*, 331 U.S. at 723 ("Decisions that define the coverage of the employer-employee relationship under the Labor and Social Security acts are persuasive in the consideration of a similar coverage under the Fair Labor Standards Act.").[2]

The district court noted that it was "unaware" of an employer-employee relationship in which the employer would allow the employee to contract with a third party to perform the work. *Brant v. Schneider Nat'l, Inc.*, 2021 WL 179597, at *4, citing *Derolf v. Risinger Bros. Transfer, Inc.*, 259 F. Supp. 3d 876, 880–81 (C.D. Ill. 2017) (finding terms of contracts between truck drivers and carrier weighed against employee status).

Brant's theoretical ability to hire help can bear little weight if it was not consistent with the economic reality of his control over his work. See *Simpkins*, 893 F.3d at 964 (reversing summary judgment deeming plaintiff to have been independent contractor). Brant alleges he was not able to take advantage of the ability to hire help because Schneider maintained total control over the number, nature, and profitability of the shipments offered. The Operating Agreement also authorized Schneider to charge a variety of fees for each new driver hired by Brant. Fixed costs were high and margins tight for drivers under the Operating Agreement and Lease with Schneider,

---

[2] *Darden* noted that Congress responded to *Silk*'s broad interpretation of the term "employee" in the Social Security Act by amending the Act to conform more closely to traditional common-law understandings of the term. 503 U.S. at 324–25. Congress never made such changes to the FLSA, however, and the FLSA should be interpreted more broadly based on its more expansive definitions. *Id.* at 325–26.

and Brant alleges that "few, if any, other Drivers hired substitutes" for this reason. If Brant wanted to take the financial risk of hiring help, Schneider reserved "the right to arrange, *at Owner-Operator's expense*, to have a qualified third-party vendor monitor" the new driver's compliance with federal safety standards. (Emphasis added.) Unlike the truckers in *Silk*, Brant alleges, it was not economically feasible for him to hire help, and his theoretical ability to do so under the contract does not indicate he was an independent contractor. See *Silk*, 331 U.S. at 719.

*Supply Equipment*: Next, the requirement that Brant supply his own truck, or "Equipment," does little to establish control over the conduct of the work because Brant leased his truck from Schneider itself. In Wisconsin, a vehicle lease transfers the right of possession and use of the vehicle to the lessee, which would ordinarily afford a significant amount of control over work done with the vehicle. See Wis. Stat. § 411.103(1)(j). In this case, however, the Operating Agreement required Brant to lease his truck back to Schneider in a grant of "exclusive possession, control, and use" of the Equipment, in compliance with 49 C.F.R. § 376.12(c)(1). According to Brant, Schneider even controlled Brant's maintenance schedule and which mechanics he could use. Under Brant's allegations, he may have had legal responsibility for the truck but little control over it. Nor could Brant rest secure in his access to and use of the truck. Schneider could declare the Lease in default and trigger financial penalties triggered for, among others, (i) a missed payment of rent or any fee under the Lease; (ii) failure to observe a condition of the Lease; or (iii) termination of the Operating Agreement.

*Routes and Schedules*: The Operating Agreement was also written to give Brant the ability to choose the route and schedule to follow when delivering a shipment, subject to an important caveat. Shipments had to be "timely" to meet the demands of Schneider's customers. This is not surprising, given the nature of the business. But Brant alleges that, due to Schneider's strict pick-up and delivery time requirements, "As a practical matter, Drivers had no choice with respect to the route." The need to access fuel stops where it was possible to purchase fuel on Schneider's credit also constrained route choice. We agree with the Ninth Circuit that "the ability to determine a driving route is simply a freedom inherent in the nature of the work and not determinative of the employment relation." *Narayan v. EGL, Inc.*, 616 F.3d 895, 904 (9th Cir. 2010) (internal quotation marks omitted). Yet Brant alleges that the economics of his work constrained his route selection, so his nominal freedom to choose a route did not determine whether he controlled his labor.

In sum, regardless of some of the nominal rights granted under the written contracts, Brant alleges that Schneider imposed detailed control over the conduct of his work and enforced that control by monitoring his operations and collecting data on his driving. As a matter of economic reality, Brant alleges, he could not hire additional drivers to assist or take over shipments, did not bring his own truck to the work, and had no real ability to exercise choice over his schedule and routes. At least on the pleadings, this factor weighs in favor of finding Brant was an employee of Schneider.

## 2. *Opportunity for Profit or Loss*

Next, we consider the degree to which Brant's opportunity for profit or loss depended upon his managerial skill.

*Lauritzen*, 835 F.2d at 1535. This question gets to the heart of the economic relationship. In theory, under the Operating Agreement and Lease, Brant had the ability to modulate the kind and volume of his work with Schneider, and could even pick up additional work from other carriers to add to his income. Brant had the ability to choose which Schneider shipments to haul, and in theory could select more shipments with higher profit margins. If Schneider did not offer enough shipments, or if the offered shipments were not favorable, the Operating Agreement allowed Brant to use the truck he leased from Schneider (and then back to it) to haul freight for other carriers. That, at least, is Schneider's theory. As we will see, Brant alleges these theoretical rights had little impact on his actual ability to increase profits.

*Choosing Shipments*: First, Brant alleges that he could not actually exercise the right to turn down shipments to select more profitable options. He says that Schneider offered him shipments without providing information about what alternatives might be offered or when, and the risk of failing to make enough money to cover Lease payments was too high for Brant to risk waiting for better shipments to become available. A failure to pay rent under the Lease would trigger a default, allowing Schneider to exercise a variety of potential remedies, including (i) terminating the Lease and demanding payment of the entire remaining amount of rent due for the Lease term; or (ii) requiring the driver to purchase the truck outright. "Drivers rarely exercised the option" to turn down a shipment because it was too risky. Brant was dependent on Schneider to pay his rent back to Schneider under the Lease. And as we will see, he alleges that Schneider did not actually permit him to drive for other carriers, giving more weight to

his limited ability to adjust the profitability of the shipments he took from Schneider.

Brant further alleges that Schneider would not actually allow him to decline to haul particularly unprofitable shipments. He alleges that Schneider "regularly required that Drivers, including Plaintiff, move empty trailers from one location to another at rates that did not even cover the cost of fuel to accomplish the task." Brant was told that Schneider "would terminate his contract if he refused to take these assignments." Schneider characterizes this arrangement as "an ordinary feature of operating one's own business as an independent contractor." We disagree because that one feature of the parties' relationship cannot be considered in isolation. Under the overall arrangement, according to plaintiff's allegations, the single biggest determinant of his profit for a workweek was not his managerial skill but Schneider's choice of loads to offer him—or to require him—to haul. As a matter of actual practice, Brant alleges, he simply had to take the loads that Schneider gave him as often as possible in the hopes of staying ahead of the pay deductions, rent, and costs.

*Hauling for Other Carriers*: Both Schneider and the district court emphasized Brant's contractual ability to haul loads for other carriers. Brant alleges he was similarly unable to take advantage of that theoretical right. First and most simply, Brant alleges that, despite the terms of the written contract allowing it, Schneider told him that it would not permit him to haul for other carriers. Even if Schneider changed its mind, it retained sole discretion to deny his request to haul freight for a different carrier. Schneider also reserved the right to arrange for third-party monitoring of compliance with federal safety regulations, *at Brant's expense*, during trips for other carriers.

Even if Brant requested and received approval to haul for another carrier and could have afforded to pay for third-party monitoring of his safety compliance, he would have been required under the Agreement to remove or cover Schneider's identification on his truck, and to display his own or the other carrier's information when applicable. Brant alleges more generally that Schneider's system for approving and monitoring trips made for other carriers was "so complex and onerous that Drivers could not, as a practical matter, carry loads for anyone other than" Schneider.

More generally, Brant's exposure to potential loss through his relationship with Schneider does not necessarily indicate he was an independent contractor. Instead, it may show only that Schneider "chose to place this added burden on its operators." *Usery v. Pilgrim Equipment Co.*, 527 F.2d 1308, 1313 (5th Cir. 1976) (reversing summary judgment for employer and ordering relief for plaintiffs as employees).

In sum, Brant alleges that as a practical matter, he could not exercise his managerial skill to increase profits by selecting more profitable loads or by driving for other carriers when Schneider offered shipments with unfavorable terms. The complaint describes a relationship under which drivers like Brant had no realistic option other than to take the shipments that Schneider offered, even when they were unprofitable. He could not haul for other carriers and relied on Schneider to receive enough favorable shipments to make a profit. In other words, he was dependent on Schneider to make a profit or loss. This factor also weighs in favor of considering Brant to have been an employee of Schneider.

### 3. The Alleged Employee's Investment

Next, we consider Brant's potential investment in equipment or materials required for hauling the shipments, or his employment of workers. *Lauritzen*, 835 F.2d at 1535. As noted, Brant alleges he did not employ workers to aid him in hauling his shipments because he lacked control over the shipments on offer. Schneider argues that Brant invested heavily in his work by signing a costly lease for one of Schneider's trucks. His lease agreement required him to pay over $40,000 per year in rent. Schneider points to case law suggesting that a "driver's investment of a vehicle is no small matter." *Herman v. Express Sixty-Minutes Delivery Service, Inc.*, 161 F.3d 299, 304 (5th Cir. 1998).

*Herman* does not help Schneider's argument on this point. Although the Fifth Circuit ultimately affirmed for other reasons a judgment deeming those delivery drivers to be contractors, it found on similar facts about investments that the investment factor actually favored treating them as employees. 161 F.3d at 304. Schneider is correct that Brant spent large sums of money while hauling freight for Schneider on the truck lease, fuel, and equipment. But this investment was made with no up-front payment and depended entirely on Schneider's providing a truck, mobile computing platform, and other equipment by extending its own credit to Brant. In theory, perhaps, Brant could have obtained his own truck, computer, and other necessary equipment with no involvement from Schneider, but he did not do so.

Brant alleges that Schneider offered its truck leases with no down payment required, no payments during the first weeks of work, and no out-of-pocket investment by the drivers. Even the security deposit for the truck was deferred and

paid in installments. Brant was totally dependent on Schneider's credit to operate, and he leased his truck back to Schneider under the Operating Agreement. This level of dependency on Schneider's credit and provision of equipment weighs in favor of employee status. See *Max Trucking, LLC v. Liberty Mutual Ins. Corp.*, 802 F.3d 793, 805 (6th Cir. 2015) (affirming judgment after trial that drivers were employees under Michigan worker's compensation law because they were "effectively economically dependent on Max Trucking for their ability to operate as truckers" (citation omitted)); *Tobin v. Anthony-Williams Mfg. Co.*, 196 F.2d 547, 548–50 (8th Cir. 1952) (reversing denial of injunction; drivers who purchased trucks without pledging credit and paid through deductions from earnings were employees, in part because they had "no substantial investment in their trucks, and their ownership is no more than nominal").

Brant alleges that he had the means to engage in the freight-hauling business only because Schneider advanced a truck, equipment, and many other resources up front on Schneider's own credit. Even though Brant was ultimately charged for these costs, his "disproportionately small stake in the [trucking] operation is an indication that [his] work is not independent of the defendants." *Lauritzen*, 835 F.2d at 1537. The investment factor also weighs in favor of employee status.

### 4. *Special Skill*

Next, we consider whether special skills required to perform the work may indicate independent contractor status. *Lauritzen*, 835 F.2d at 1535. Excellence at any occupation can be said to require skills, but this inquiry is focused on specialized skills that set the independent contractor apart from other workers. *Id.* at 1537. As we noted in *Lauritzen*,

developing the specialized skill required to recognize which pickles to pick and when was "no different from what any good employee in any line of work must do. Skills are not the monopoly of independent contractors." *Id.*

Similarly, when assessing whether women who operated laundry pick-up stations were employees of a laundry company, the Fifth Circuit emphasized that the basic business and organizational skills the women displayed to operate their stations were valuable, but "many successful employees need these same abilities and perform similar tasks." *Pilgrim Equipment*, 527 F.2d at 1315. Special skills weigh in favor of independent contractor status partly because independent contractors often develop relationships with many businesses based on expertise and can command higher rates through superior performance. See *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998). With these concepts in mind, an assessment of the skills Brant needed to haul freight for Schneider is inconclusive.

Schneider leased Brant a truck that could weigh up to 40 tons with trailer and cargo and required him to provide "competent professional drivers" responsible for the operation and maintenance of the vehicle. Commercial truck-driving requires skills beyond those of automobile drivers, but the skills demanded by Schneider do not set Brant apart from the many other commercial truck drivers whom Schneider treats as employees. Brant also alleges that he performed his work according to the same procedures and standards required of Schneider's employee-drivers. Brant's talents "do not change the nature of [his] employment relationship with the defendants" so as to make him an independent contractor, but they also require more training and skill than may be demanded of many

employees. *Lauritzen*, 835 F.2d at 1537. This factor is neutral at best for Schneider's position.

### 5. *Permanency and Duration*

Next, we ask whether the permanency and duration of the relationship indicates an employment relationship. *Lauritzen*, 835 F.2d at 1535. Brant alleges that he signed Operating Agreements that were "routinely renewed." Schneider sent reminder notices to drivers who failed to sign a new contract promptly. Brant leased his truck from Schneider for 24 months, and he alleges that Schneider included this longer lease term in the expectation that it would offer to renew the one-year Operating Agreement after the first year.

Schneider notes that its Operating Agreements with Brant did not automatically renew, but again, we are interested in economic reality, not just contractual terms. See *Simpkins*, 893 F.3d at 964; *Lauritzen*, 835 F.2d at 1545 (Easterbrook, J., concurring). Automatic renewal would weigh more heavily in favor of employee status but is not required. As a matter of practice, Brant pleads, Schneider did renew its contract with him in January 2019. This indicates a relationship with enough duration to weigh in favor of employee status, though weakly. See *Lauritzen*, 835 F.2d at 1537 (affirming summary judgment finding employee status; harvesters' temporary, exclusive working relationships that were renewed "year after year" showed relative permanency consistent with employment); see also *Flint Engineering*, 137 F.3d at 1442 (affirming summary judgment finding employee status; duration and permanence of riggers' relationship with alleged employer indicated employee status, although riggers "rarely work for Flint more than two months at any one time, and rarely for more than

three months during any twelve-month period"), citing *Lauritzen*, 835 F.2d at 1537.

### 6.  *Integral Part of Alleged Employer's Business*

The last *Lauritzen* factor is the degree to which Brant's service was integral to Schneider's business. 835 F.2d at 1535. Schneider is a freight hauling company, and Brant alleges that he hauled shipments for Schneider in the same way as the company's employee-drivers. Schneider admits that this factor "likely weighs in Brant's favor." We agree.

To sum up on the FLSA claim, we consider Brant's allegations about the economic reality of his working relationship with Schneider using the *Lauritzen* factors as applied to the totality of the circumstances, and we seek to gauge whether Brant was sufficiently controlled by and dependent upon Schneider to come within the protection of the FLSA as an employee. See *Simpkins*, 893 F.3d at 964; *Lauritzen*, 835 F.2d at 1538. No one *Lauritzen* factor is decisive, see *Simpkins*, 893 F.3d at 964, but five of the six factors, including control, weigh in favor of employee status, and the sixth is at best neutral. Based on facts alleged in the complaint, Brant had little true control over the conduct of his work and was totally dependent on Schneider to turn a profit. He was not able to exercise his theoretical contractual rights to hire workers or to haul for other carriers. In short, Brant alleges facts allowing the plausible inference that he was so controlled by and dependent on Schneider that he must be considered an employee as a matter of economic reality. *Id.* Because Brant also alleges he was not paid the minimum wage during at least one workweek, he states a legally viable claim for minimum wage under the FLSA.

B.  *Wisconsin Minimum Wage Claim*

Brant also alleges that Schneider violated Wisconsin's minimum wage law. Wisconsin has a longer history of regulating minimum wages than the federal government. It adopted a law requiring employers to pay a "living wage" to women and minors in 1913. William L. Crow, *History of Legislative Control of Wages in Wisconsin*, 16 Marq. L. Rev. 188, 192 (1932). Wisconsin has continued to update its minimum wage regulations. See, e.g., 2015 Wis. Act 55, § 3078gm; *Historical Résumé of Minimum Wage Regulations in Wisconsin*, Dep't of Workforce Dev., https://dwd.wisconsin.gov/er/laborstandards/minwageregs.htm (last visited Aug. 3, 2022).

The district court consolidated the inquiries under the FLSA and Wisconsin minimum wage law, but we do not believe that is appropriate here. Some states expressly indicate that certain state minimum wage provisions should be interpreted to conform with the FLSA, see, e.g., Mo. Ann. Stat. § 290.505(4) ("this section shall be interpreted in accordance with the Fair Labor Standards Act"), but Wisconsin has not done so for the provisions at issue here. The closest Wisconsin comes is to incorporate certain FLSA exemptions into the Wisconsin definition of employee, but these provisions are not relevant here. See Wis. Stat. § 104.01(2)(b)(3). Because the definitions of employer and employee are distinct under the FLSA and Wisconsin law, and Wisconsin courts have not adhered to a *Lauritzen*-style multi-factor test, we treat Brant's claim for minimum wage under Wisconsin law separately.

Relevant here, Wisconsin law requires that "Every wage paid … by any employer to any employee" be no less than the state minimum. See § 104.02. To avoid dismissal, Brant needed to plead facts showing it is plausible that he was an

employee protected by these state minimum wage provisions and that he was not paid the Wisconsin minimum wage during at least one workweek. See *id.*; *Twombly*, 550 U.S. at 570. The general Wisconsin minimum wage equals the federal minimum wage of $7.25 per hour, and as noted above, Brant alleges that he received less than this in compensation from Schneider during at least one workweek. See 29 U.S.C. § 206(a)(1)(C); Wis. Stat. § 104.035(1)(a). He states a claim for minimum wage under Wisconsin law if we can plausibly infer from the pleadings that he was an employee within the meaning of the Wisconsin law.

Wisconsin's minimum wage law defines "employee" broadly and in reference to the definition of "employer":

> (2)(a) "Employee" means every individual who is in receipt of or is entitled to any compensation for labor performed for any employer.
>
> …
>
> (3)(a) The term "employer" shall mean and include every person, firm or corporation, agent, manager, representative, contractor, subcontractor or principal, or other person having control or direction of any person employed at any labor or responsible directly or indirectly for the wages of another.
>
> …
>
> (8) "Wage" means any compensation for labor measured by time, piece, or otherwise.

§ 104.01.

Wisconsin courts do not appear to have addressed squarely the boundary between employee and independent contractor for minimum wage purposes. In the absence of an authoritative opinion from the Wisconsin Supreme Court, we interpret §§ 104.01 and 104.02 as we believe the state's highest court would construe them. *Laborers Local 236 v. Walker*, 749 F.3d 628, 634 (7th Cir. 2014). As we noted in *Laborers Local 236*, "Wisconsin law requires courts to 'focus primarily on the language of the statute,' as Wisconsin courts 'assume that the legislature's intent is expressed in the statutory language.'" *Id.*, quoting *State ex rel. Kalal v. Circuit Court for Dane County*, 681 N.W.2d 110, 124 (Wis. 2004). We begin our analysis with the statutory text.[3]

The mention of control in the definition of "employer" in Wisconsin's minimum wage law is significant, though it is not the exclusive method of showing employer status. § 104.01(3)(a). The text of the statute suggests that a business can also become an employer by being responsible for a person's wages, i.e., compensation for labor. See

---

[3] We identified only a handful of reported cases citing Wisconsin's minimum wage provision, and none of them address the line between employee and independent contractor. See *Kieninger v. Crown Equip. Corp.*, 924 N.W.2d 172 (Wis. 2019) (time spent driving between home and job site in company vehicle); *Martinez v. Department of Indus., Labor & Human Relations*, 478 N.W.2d 582 (Wis. 1992) (constitutionality of statute permitting legislative supervision of administrative rules, employee status not at issue); *Sheaffer v. Industrial Comm'n*, 139 N.W.2d 106 (Wis. 1966) (employee status not at issue in case on counting tips as part of minimum wage); *O'Brien v. Travelers Inn, LLC*, No. 2018AP1483, 2019 WL 1284828 (Wis. App. Mar. 21, 2019) (employee status not at issue; employer violated law by providing lodging but no pay).

§ 104.01(3)(a) & (8). Even so, the textual reference to "control" links this definition to the broader sweep of Wisconsin law.

Wisconsin defines employer and employee differently under its minimum wage law than in other labor and compensation contexts, such as worker's compensation, §§ 102.04 & 102.07, and unemployment insurance, § 108.02(12) & (13). The state's courts have interpreted the boundaries of employee status repeatedly in these and other areas of law during the last century and place a heavy emphasis on the alleged employer's right to control the manner and conduct of the work.[4]

Based on the text of § 104.01(3)(a) and the consistent focus on control shown across various areas of Wisconsin employment law, allegations giving rise to a plausible inference of control over a person employed at labor are enough to plead that a person or business is an employer under Wisconsin's minimum wage law. For the reasons stated above in the discussion of control under the FLSA, we believe the Wisconsin Supreme Court would find that Brant pleads sufficient facts to allow a plausible inference that Schneider controlled his work as an employee. Because he plausibly alleges that

---

[4] See *Price County Tel. Co. v. Lord*, 177 N.W.2d 904, 910 (Wis. 1970) (unemployment compensation); *Employers Mut. Liability Ins. Co. v. Brower*, 272 N.W. 359, 361 (Wis. 1937) (tort liability), quoting *Kolman v. Dvorak*, 262 N.W. 622, 623 (Wis. 1935); *Badger Furniture Co. v. Industrial Comm'n*, 227 N.W. 288, 289 (Wis. 1929) (worker's compensation); *Miller & Rose v. Rich*, 218 N.W. 716, 717 (Wis. 1928) (entertainer was contractor not covered by worker's compensation law because "[h]is act was not subject to direction or control"); *James v. Tobin-Sutton Co.*, 195 N.W. 848, 848–49 (Wis. 1923) (tort liability); *Madix v. Hochgreve Brewing Co.*, 143 N.W. 189, 190–91 (Wis. 1913) (workplace injury); *Rieke v. Labor & Indus. Review Comm'n*, No. 85-2307, 1986 WL 217248, at *2–3 (Wis. App. Sept. 17, 1986) (worker's compensation).

Schneider was his employer and that he was paid less than the Wisconsin minimum wage in at least one workweek, Brant states a claim for minimum wage under Wisconsin law.[5]

### C. *Unjust Enrichment*

Brant also seeks compensation for unjust enrichment under Wisconsin law. Recovery for unjust enrichment is based not on breach of a contract but on "the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust." *Sands v. Menard*, 904 N.W.2d 789, 798 (Wis. 2017), quoting *Watts v. Watts*, 405 N.W.2d 303, 313 (Wis. 1987). Brant cannot recover for unjust enrichment if he entered a valid contract with Schneider. *Carroll v. Stryker Corp.*, 658 F.3d 675, 682 (7th Cir. 2011). As a threshold matter, Brant must plead facts allowing a plausible inference that the Operating Agreement and Lease were not valid. See *Twombly*, 550 U.S. at 570. Then, to make a claim for unjust enrichment, Brant must allege facts that if

---

[5] This result is consistent with Wisconsin law addressing the employer-employee relationship between truck drivers and the companies they work for in other legal contexts. See *Star Line Trucking Corp. v. Department of Indus., Labor & Human Relations*, 325 N.W.2d 872, 878–79 (Wis. 1982) (truck drivers who owned their trucks were not employees for unemployment compensation purposes when evidence did not show company controlled the drivers); *Employers Mut. Liability Ins. Co. v. Brower*, 272 N.W. 359, 360–62 (Wis. 1937) (truck driver who owned his truck was not employee for tort liability purposes in part because company had almost no right to control details of his work); *Badger Furniture Co. v. Industrial Comm'n*, 227 N.W. 288, 289–90 (Wis. 1929) (salesman who owned his car and sold goods for multiple manufacturers was not employee for worker's compensation purposes when company had no right to control his activities).

true would allow the plausible inference that (i) he conferred a benefit on Schneider; (ii) Schneider appreciated or had knowledge of the benefit; and (iii) Schneider accepted or retained the benefit under circumstances making it inequitable to do so. See *Sands*, 904 N.W.2d at 798.

### 1. Validity of the Contracts

Brant argues his contracts with Schneider were not valid because they were unconscionable under Wisconsin law. Wisconsin describes unconscionability as "the absence of meaningful choice on the part of one of the parties, together with contract terms that are unreasonably favorable to the other party." *Wisconsin Auto Title Loans, Inc. v. Jones*, 714 N.W.2d 155, 165 (Wis. 2006). To find a contract is unconscionable, there must be a combination of procedural and substantive unconscionability—one or the other alone is not enough. See *id.* at 164; *Discount Fabric House of Racine, Inc. v. Wisconsin Tel. Co.*, 345 N.W.2d 417, 425 (Wis. 1984). "The more substantive unconscionability present, the less procedural unconscionability is required, and vice versa." *Wisconsin Auto*, 714 N.W.2d at 165.

For procedural unconscionability, we consider factors that affected the formation of the contract and whether there was a "real and voluntary meeting of the minds." *Id*. For substantive unconscionability, we consider factors that bear on the "reasonableness of the contract terms themselves." *Deminsky v. Arlington Plastics Machinery*, 657 N.W.2d 411, 422 (Wis. 2003) (citation omitted).

Brant alleges the Operating Agreement and Lease were procedurally unconscionable because (i) on his own, he could not understand the long, complex documents, which were

filled with legal terminology; (ii) Schneider prevented him from obtaining legal advice before signing to help him understand; and (iii) he was unable to negotiate the terms of the contracts if he had understood them. In Wisconsin, the factors to consider for procedural unconscionability include but are not limited to:

> age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms would have been permitted by the drafting party, and whether there were alternative providers of the subject matter of the contract.

*Wisconsin Auto*, 714 N.W.2d at 166.

Brant has completed high school and some community college and online courses. The Operating Agreement and Lease consist of 80 and 30 pages, respectively, of dense legal prose. Brant alleges that the highly technical language of many of the contractual provisions was beyond his ability to understand without help and in limited time, and Schneider did not permit him to obtain legal advice about the contracts before signing. Even if Brant had understood the contracts, Schneider did not permit negotiation over contractual terms. Without significant time or legal assistance, we must assume, it would be difficult for someone with Brant's education and experience to understand the terms of the Operating Agreement and Lease. Brant alleges a mismatch in bargaining power and inability to obtain an explanation of the contracts' terms that allows a plausible inference of low-grade procedural unconscionability. See 714 N.W.2d at 166.

Schneider argues that even if the Operating Agreement was procedurally unconscionable when Brant entered it, he signed a second Operating Agreement in early 2019, for which he had ample time to prepare. This is not a persuasive rebuttal. Brant's Lease of the truck lasted two years. When he signed the second Operating Agreement, he remained obligated under the Lease—if it was valid. Brant might have a weaker claim for procedural unconscionability for his second Operating Agreement, but that does not mean he cannot state a claim.

Next, Brant alleges that the Operating Agreement and Lease were substantively unconscionable. Under Wisconsin law, we assess substantive unconscionability by determining whether the contract terms are commercially reasonable or lie outside the limits of what is reasonable and acceptable. *Wisconsin Auto*, 714 N.W.2d at 166. This inquiry is done in light of the relevant commercial background. *Id.*

Brant alleges procedural unconscionability only relatively weakly, so he must allege a greater degree of substantive unconscionability than he would otherwise. 714 N.W.2d at 165. Brant points to several provisions of the Operating Agreement that have the intended effect of inoculating Schneider against potential financial harm from its own violation of federal and state employment law. The first purports, among other things, to require Brant to "defend, indemnify and hold harmless" Schneider for any legal liability arising out of, in part:

> (ii) compliance or non-compliance with *any applicable federal, state or local employment laws*;

> (iii) *any employment issues* relating to Owner-Op-
> erator or its agents or employees, including but
> not limited to, *allegations of discrimination*, retali-
> ation, *violations of public policy, failure to pay over-
> time or wages when due*, failure to comply with
> any applicable federal, state or local law enti-
> tling eligible employees to meal and/or rest
> breaks….

Owner-Operator Operating Agreement at 22, Dkt. 71-2 (em-
phases added).

Schneider crafted this indemnity provision in broad terms
that ostensibly shift to Brant himself *any* liability not only for
Brant's violations of employment laws but also for its *own* em-
ployment law violations of *any* kind, even if Brant was the vic-
tim of Schneider's violations. Enactments of Congress and the
Wisconsin legislature are not so easily defeated by such ag-
gressive drafting of a contract. See, e.g., *Barrentine v. Arkansas-
Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) ("FLSA rights
cannot be abridged by contract or otherwise waived because
this would 'nullify the purposes' of the statute and thwart the
legislative policies it was designed to effectuate); *Brooklyn Sav-
ings Bank v. O'Neil*, 324 U.S. 697, 704 (1945) ("It has been held
in this and other courts that a statutory right conferred on a
private party, but affecting the public interest, may not be
waived or released if such waiver or release contravenes the
statutory policy.").

Wisconsin law enforces some indemnity provisions that
shift liability, such as for the indemnitee's own negligence,
though these provisions must be presented conspicuously
and will be construed strictly. See *Deminsky*, 657 N.W.2d at
420–23 (requiring purchaser of used machinery to indemnify

seller for injury to purchaser's employee). But the provisions drafted by Schneider do more than assign risk for the indemnitee's torts in a private transaction. If these provisions in Schneider's contracts are valid, then Schneider and other companies can turn back the clock to a time when low wages, long hours, workplace discrimination, and other forms of abuse were subject to relatively little regulation. Furthermore, Schneider may have little need to test the validity of these provisions through enforcement if they have the intimidating effect on employees that seems to have been intended.

The Operating Agreement contains an additional provision that is triggered if Brant is determined to be an employee of Schneider. When implemented, the Agreement would be rescinded and Brant would immediately owe Schneider all gross compensation received under the contract and would relinquish any rights to balances in escrow funds then owed to him by Schneider. Rescission of the Agreement also constitutes a default on the Lease unless Schneider exercises its sole discretion to approve the driver to enter a new contract with another carrier within five days. As explained above, defaulting on the Lease can lead to serious financial consequences.

These contractual provisions seem to have been designed to evade federal and state employment law, to nullify remedies under those laws, and to discourage workers from asserting their rights. The legal effect of these provisions, if any, may be limited by contract doctrines other than unconscionability. See, e.g., *American Family Mut. Ins. Co. v. Cintas Corp. No. 2*, 914 N.W.2d 76, 82–83 (Wis. 2018) (suggesting Wisconsin law may not enforce certain contract provisions that violate public policies to "protect a weaker party against the unfair exercise of superior bargaining power by another party"); *In*

*re F.T.R.*, 833 N.W.2d 634, 652 (Wis. 2013) ("A contract will not be enforced if it violates public policy."); see also *Kellogg v. Larkin*, 3 Pin. 123, 135–37 (Wis. 1851) (noting "legislative enactment" is best evidence of "uncertain and fluctuating" limits of public policy in contract law).

Brant alleges a low degree of procedural unconscionability due to the complexity of the contracts and Schneider's efforts to deny Brant legal counsel to review them. The inference of substantive unconscionability based on the indemnity and rescission provisions discussed above is fairly strong. In combination, Brant alleges more than enough for us to infer plausibly that his contracts were so "unreasonably favorable" to Schneider that they were void as unconscionable. *Wisconsin Auto*, 714 N.W.2d at 165.

### 2. Unjust Enrichment

Again, to state a claim for unjust enrichment Brant must allege facts that, if true, would allow the plausible inference that (i) he conferred a benefit on Schneider; (ii) Schneider appreciated or had knowledge of the benefit; and (iii) Schneider accepted or retained the benefit under circumstances making it inequitable to do so. See *Sands*, 904 N.W.2d at 798. Schneider does not attempt to defend its indemnity and rescission provisions, and it addresses little of the substance of Brant's unconscionability argument. Brant clearly alleges that he conferred a benefit on Schneider that it appreciated in the form of the payments and paycheck deductions he made for operating expenses. He has also plausibly alleged that his contracts with Schneider were unconscionable and void. The Operating Agreement purported to make Brant liable for any employment law violations by Schneider while it allegedly engaged in an unfair and illegal scheme misclassifying Brant. The

inference is that Schneider may have thought these *in terrorem* provisions would facilitate its alleged efforts to misclassify Brant as an independent contractor. Brant has plausibly alleged circumstances under which it would be inequitable for Schneider to retain the benefit conferred.

D.  *Truth-in-Leasing Claim*

Finally, Brant also alleges that Schneider violated several federal regulations that can support a private right of action. The Department of Transportation regulates the activities of motor carriers like Schneider under the ICC Termination Act of 1995, Pub. L. No. 104-88, § 13501, 109 Stat. 803, 859. Within the Department, the Federal Motor Carrier Safety Administration enforces regulations that impose restrictions on lease agreements between motor carriers and owner-operators of trucks. These rules are known as the Truth-in-Leasing regulations. See 49 C.F.R. Part 376; see also Lease and Interchange of Vehicles, 43 Fed. Reg. 29812, 29812 (July 11, 1978) (identifying promotion of "truth-in-leasing" as one objective). Schneider provided a truck to Brant under the Lease, and through the Operating Agreement, Brant then leased that truck back to Schneider for use during shipments. Brant's Truth-in-Leasing claims are based on both the Lease through which he obtained his truck and the Operating Agreement through which he leased it back to Schneider.

The Truth-in-Leasing regulations are designed "to promote full disclosure between the carrier and owner-operator in the leasing contract, to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry, and to eliminate or reduce opportunities for skimming and other illegal practices." 43 Fed. Reg. at 29812. Brant alleges that Schneider violated three of these regulatory

requirements, including the requirement (i) to make available certain documentation used to calculate Brant's pay; (ii) to provide documentation supporting deductions from his pay; and (iii) to specify the amount of any escrow fund required. See 49 C.F.R. § 376.12(g), (h), & (k) (2020).

Brant can sue Schneider for damages from these potential regulatory violations under 49 U.S.C. § 14704(a)(2). See *Owner-Operator Independent Drivers Ass'n v. Mayflower Transit, LLC*, 615 F.3d 790, 791–92 (7th Cir. 2010) (considering a suit under § 14704(a)(2) for alleged chargeback violations). To state a claim, Brant must allege facts from which we can plausibly infer that Schneider violated one or more of the regulations and that he was damaged as a result. See § 14704(a)(2).

First, Brant alleges that Schneider violated 49 C.F.R. § 376.12(g) by failing to disclose that a copy of the rated freight bills would be available prior to settlement for his shipments. Section 376.12(g) provides, in relevant part:

> When a lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the authorized carrier will give the lessor, *before or at the time of settlement, a copy of the rated freight bill*, or, in the case of contract carriers, *any other form of documentation actually used for a shipment containing the same information* that would appear on a rated freight bill.

(Emphases added.) This disclosure requirement protects owner-operators from unscrupulous carriers who might be tempted to hide such information, to underpay for the shipment, and to pocket the difference. Without the requirement

that this information be made available before settlement, drivers like Brant might never know if they were being underpaid.

Brant alleges that the Operating Agreement—which contains the relevant lease provisions for this claim—did not disclose that this information would be available *at or before settlement* as required. His allegations add up to a violation of the regulation. However, Brant must also allege damages to state a claim under § 14704(a)(2).

Schneider argues that Brant fails to allege that any potential Truth-in-Leasing violations caused damages. In support of this argument against Brant's first Truth-in-Leasing claim, Schneider points to *Stampley v. Altom Transport, Inc.*, 958 F.3d 580 (7th Cir. 2020). But *Stampley* was quite different as to both its facts and its procedural posture. In *Stampley*, the driver received computer-generated summaries of the rated freight bill when he was paid. *Id.* at 587. In contrast, Brant does not allege that he actually received these documents. In *Stampley*, the driver complained that his carrier did not include certain tank-wash charges billed to the customer in these computer-generated summaries. However, the lease he entered with his carrier included a provision waiving "all rights to contest the validity or accuracy of any/all payments" after 30 days. Because he did not contest any payments within 30 days, or request documentation to verify the computer-generated summaries he received of the rated freight bill, we enforced the contract and found his claim failed. *Id.* at 587–89. We also considered *Stampley* on appeal of the district court's grant of summary judgment, whereas Brant's claim comes to us on a motion to dismiss on the pleadings. Schneider's suggestion that

*Stampley* forecloses Brant's damages argument under § 376.12(g) is unpersuasive.

Section 376.12(g) is a disclosure mandate that protects owner-operators by requiring that the lease disclose the availability of information useful to ensure the carrier does not shortchange the driver at settlement. The lease must specify *when* this information is to be made available, and then the carrier must provide it or be in breach of contract. Because Schneider did not clarify in the Operating Agreement when this information would be available—i.e., at or before settlement—Brant allegedly did not know that one of the significant disclosure protections provided him by the Truth-in-Leasing regulations was being violated.

There is no allegation that Schneider actually provided equivalent information from the rated freight bill at or before the time of settling payment with Brant for a shipment. Instead, Brant alleges that Schneider "did not provide Plaintiff … with copies of documents from which the rates and charges … are computed," and that Schneider "underpaid Plaintiff." He further alleges that the failure to disclose the rated freight bill or equivalent information to him prevented him from contesting the alleged underpayment. This sufficiently alleges he was harmed by the violation for him to state a claim for relief under 49 U.S.C. § 14704(a)(2).

Second, Brant alleges that he was harmed by Schneider's failure to provide information required to determine the validity of chargebacks deducted from his pay. Such chargebacks are governed by 49 C.F.R. § 376.12(h):

> The lease shall clearly specify all items that may
> be initially paid for by the authorized carrier,

but ultimately deducted from the lessor's com-
pensation at the time of payment or settlement,
together with a recitation as to how the amount
of each item is to be computed. *The lessor shall be
afforded copies of those documents which are neces-
sary to determine the validity of the charge.*

(Emphasis added.) Brant alleges that Schneider withdrew ap-
proximately $1,200 from his bank account, and when he con-
tacted Schneider to request information about the charge, he
received nothing. Assuming, as we must, that these allega-
tions are true, Brant states a claim for a violation of § 376.12(h)
under 49 U.S.C. § 14704(a)(2).

Third, Brant alleges that Schneider did not disclose the
amount of all escrow funds in the Operating Agreement and
Lease in violation of 49 C.F.R. § 376.12(k)(1). Under
§ 376.12(k)(1), Schneider was required to specify in its lease
"The amount of any escrow fund or performance bond re-
quired to be paid by the lessor to the authorized carrier or to
a third party." Brant alleges that "Schneider also deducts from
Drivers' paychecks amounts to fund an 'escrow account' held
by Schneider as purported 'security' for unstated 'obligations'
of Drivers. If at any point the 'escrow account' drops below
the balance required by Schneider, Schneider deducts addi-
tional funds from Drivers' paychecks to replenish the 'escrow
account.'" This allegation involves required escrow payments
that are allegedly not explained in the Operating Agreement
or Lease and are not further described. This is enough to allow
the plausible inference that Schneider violated § 376.12(k)(1).
Because Brant alleges that these escrow amounts were not re-
turned to him upon termination, he also alleges damages

from this potential violation and can state a claim for violation of § 376.12(k)(1) under 49 U.S.C. § 14704(a)(2).

Brant has alleged legally viable claims for relief under the Fair Labor Standards Act, Wisconsin minimum-wage law, Wisconsin law of unjust enrichment, and the federal Truth-in-Leasing regulations. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.